Kassab et ux., Appellants, *v.* Central Soya.

218

Argued March 15, 1968. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

re-argument refused December 13, 1968.

*Adolph L. Zeman*, with him *Robert L. Zeman*, and *Zeman and Zeman*, for appellants.

*Wray G. Zelt, III*, with him *Zelt and Zelt*, for appellee, manufacturer.

*Charles C. Keller*, with him *Peacock, Keller & Yohe*, for appellee, seller.

OPINION BY MR. JUSTICE ROBERTS, October 11, 1968:

Appellants, man and wife, are engaged in the business of breeding Charolais cattle. On December 14, 1961 they placed an order for cattle feed with defendant-appellee, Pritts. This feed was to be blended by

Pritts according to a formula previously used by appellants for their cattle and previously blended by Pritts. One of the ingredients in appellants' formula was a commercially packaged feed supplement known as "Cattle Blend," manufactured by defendant-appellee Central Soya. Pritts blended the feed supposedly according to appellants' formula whereupon it was fed to Mr. and Mrs. Kassab's herd. Shortly thereafter the cows in the herd began to abort and the breed bull began behaving in a manner which tended to cast doubt upon his masculinity. He was eventually pronounced sterile.

Fearing that the feed supplement used in appellants' formula had somehow caused the malfunctioning of the Kassab's cattle, a chemical analysis was made which revealed the presence of a drug known as "stilbestrol" in the feed, and more particularly in the feed supplement, Cattle Blend. Although appellees contest this fact the trial judge, sitting without a jury, found on the basis of competent evidence that stilbestrol was in the feed, a finding which this Court will not disturb on appeal. It is conceded by all concerned that stilbestrol is customarily added to feed for *beef* cattle since it has a tendency to make the cattle gain weight. However, it is also conceded that stilbestrol is a synthetic hormone which tends to accentuate the female characteristics in animals, inducing heat and abortions in cows and sterility in bulls. Accordingly, feed containing this drug is not recommended for breed cattle. In fact, a federal regulation requires that feed containing stilbestrol be so labeled and that this label state, inter alia, that the feed is not to be fed to breeding or dairy animals. 21 Code of Federal Regulations §121.241 (1964). It is finally conceded that no such label appeared on the bag of Cattle Blend used by Pritts in compounding appellants' feed formula. Ob-

viously, Central Soya mistakenly packed its stilbestrol-added feed supplement into a bag supposed to contain a supplement without stilbestrol. Therefore, although appellants ordered feed without stilbestrol, and although Pritts thought that this is what he had mixed, in fact the feed sold to appellants did not conform to the mixture ordered.

Alleging (1) that the stilbestrol in the feed caused their cows to abort and their bull to become sterile; and (2) that community knowledge of what the herd had eaten resulted in appellants' inability to sell their stock except at beef prices thus greatly diminishing the value of appellants' property, Mr. and Mrs. Kassab commenced this action in assumpsit against Pritts and Central Soya. The case was heard before a judge sitting without a jury. At the conclusion of the testimony on the issue of liability for breach of contract, the court and counsel agreed that no written opinion need be filed, but rather that the judge could announce his decision on liability from the bench, thereby dispensing with the need for hearing testimony on damages should the court find for defendants. Accordingly, the court announced a verdict for defendants, and orally (later in a written opinion) stated that, although it found that stilbestrol was present in the feed contrary to the formula ordered, nevertheless there should be a verdict for defendants because the court believed defendants' expert who testified that the amount of drug in the feed could not have caused the abortions and sterility complained of. This appeal followed.

## I.

Appellants first argue that the court below erred in announcing its decision from the bench and in filing an opinion without conclusions of fact or law. It

is also contended that the court was required to hear all of the testimony, including evidence on damages, before reaching any decision. We are unpersuaded that either of these acts by the court constitutes reversible error.

The record clearly reveals that the trial judge was well aware of the rules governing trials without a jury. At the conclusion of the evidence on liability, he summoned both counsel to side bar and discussed with them the possibility of dispensing with the requirements of the Act of April 22, 1874, P. L. 109, §2, as amended, 12 P.S. §689, that the decision of the court be in writing. The court first properly pointed out that, from a formal viewpoint, it could not resort to Pa. R. C. P. 1048 which does allow an oral decision to be rendered from the bench because Rule 1048 applies only to trespass actions. However, while not being able to invoke Rule 1048 on its own motion, the court assumed that, with the consent of both counsel, there would be nothing to prevent it from waiving the requirements of the Act of 1874 and, in fact, using a Rule 1048 type procedure. To this both lawyers readily agreed. Now, the losing party below, while candidly admitting to this Court that he consented to everything done in this respect by the trial court, urges us to reverse for failure to comply with the Act of 1874. It is appellants' contention that regardless of what they might have consented to, the act is mandatory and, by requiring a formal written opinion, obviously demands that all evidence, on liability *and* damages, be heard.

Such a contention evokes little sympathy from this Court. We are not here dealing with a constitutional right, a waiver of which is always approached with the utmost caution. Instead, this is a civil action wherein both parties are represented by counsel. That

these lawyers, along with the trial judge and in open court, agreed to waive the formal requirements of a procedural statute in order to make the trial proceed in a more expeditious manner cannot form the basis for an attack upon that court's decision by the litigant now unhappy with his choice. To be sure, we have found no authority whatsoever for holding the Act of 1874 mandatory when both parties agree to relax its provisions. Cf. *Pittsburgh's Petition*, 243 Pa. 392, 90 Atl. 329 (1914). Moreover, as for appellants' argument that the court erred in failing to file an opinion with separate findings of fact and conclusions of law, the Act of 1874 recites that an opinion *of this type* need not be filed unless requested by the parties. No such request was ever made.

Appellants next attack the procedure of this litigation on the ground that the Act of April 22, 1874, P. L. 109, §1, 12 P.S. §688 was not properly applied. This section requires that a suit may be tried without a jury only if the parties so stipulate by agreement filed "in the proper office where such suit is pending." It appears that, in the present case, shortly before the court announced its verdict the judge discovered that no such agreement had been filed. Again, both parties agreed to read the required stipulation into the record at that point in the trial. This was done and appears of record at page 712a. Appellants now maintain that the entire suit must be retried because the agreement was not submitted to the court before trial. For the same reasons set forth in the preceding paragraph this contention is without merit. This Court said of a consensual failure to comply with practically identical language in Article 5, section 27 of our state Constitution: "There was no formal agreement for such submission [to a judge sitting alone] and waiver [of a jury] filed in this case; but to allow

a party at whose instance a proceeding [trial without jury] has been appointed, and who has taken advantage of it by pursuing it, to afterwards defeat it, against the wishes of the opposing party, by alleging his own default in the matter of filing a formal written agreement, would be to suffer the strict letter of the law to overcome its clear purpose." *Pittsburgh's Petition,* supra at 395-96, 90 Atl. at 330. Considering that the *Pittsburgh* Court was interpreting a state *Constitutional* provision and nevertheless denied relief when *no* written agreement was filed at all, we have no reluctance in the present case to hold appellants to their original agreement.

## II.

Turning to the merits of this controversy, appellants maintain that the court below, having found as a fact that stilbestrol was in the feed contrary to the formula ordered, had no choice but to find for them on the issue of liability, since the tainted feed constituted a clear breach of the implied warranty of merchantability and of the warranty of fitness for a particular purpose. With this contention we agree. The court declared that it was basing its decision of no breach of warranty on its finding that plaintiffs failed to establish that the tainted feed caused any injury to their cattle. But the question of injury, we believe, goes only to the amount of damages and will not affect a finding that the contract itself was breached. Accordingly, on the facts as found appellants were at least entitled to a verdict in their favor for nominal damages.

We reach this conclusion as to liability for breach of warranty only after rejecting the arguments of the two defendant-appellees that they are individually not

liable under the implied warranty provisions of the Uniform Commercial Code. Act of October 2, 1959, P. L. 1023, §2, 12A P.S. §§2-314, 2-315 (Supp. 1967). Appellee Central Soya, the feed supplement manufacturer, argues that it cannot be liable for breach of any implied warranty because it was not in privity with appellants.

At the outset, it is clear that the privity issue is properly before this court. Appellees raised the privity issue initially in a nonsuit motion, at the close of appellants' evidence. Although the privity issue was not raised again before the trial court, the parties, at the conclusion of appellees' evidence, chose to proceed under Pa. R. C. P. 1048.[1] Under this procedure, the trial judge, sitting without a jury, may render an oral verdict at the conclusion of the trial. *After* the verdict is rendered, exceptions may be filed within twenty days. The procedure obviously does not contemplate the making of the usual motions that are made in a jury case before the verdict; rather, the intent is to expedite the rendering of the verdict by avoiding those motions, filing of suggested findings of fact, conclusions of law, etc. Thus it cannot validly be argued that appellees waived their privity argument by not making motions based upon it before the verdict. Once the verdict was rendered in its favor, appellees certainly could not have been required to take exceptions.

Before this Court, appellees again have properly raised the privity issue as a ground for affirmance. This issue, having been properly raised throughout this proceeding, must now be decided.[2]

---

[1] Although Pa. R. C. P. 1048 by its terms applies to trespass actions, the trial judge, with the agreement of the parties, chose to utilize it here.

[2] We take no position as to whether under these facts, we could also choose to hear the privity issue, even if *not* properly

There is, of course, no doubt that the feed supplied by Central Soya failed to meet the requirements of merchantability. Section 2-314 of the code lists, inter alia, the following requirements that goods must meet to be merchantable: they must be "fit for the ordinary purposes for which such goods are used" and must be "adequately contained, packaged, and labeled as the agreement may require." It was properly found below that the Cattle Blend supplied by Central Soya was *not* fit for the ordinary purpose of feeding to breed cattle and was *not* properly labeled. But Soya disclaims liability because appellants purchased the feed from Pritts and cannot therefore maintain an action in assumpsit against Soya, a remote manufacturer.

Indeed, were we to continue to adhere to the requirement that privity of contract must exist between plaintiff and defendant in order to maintain an action in assumpsit for injuries caused by a breach of implied warranty, there would be no doubt that Soya could escape liability under the authority of *Miller v. Preitz,* 422 Pa. 383, 221 A. 2d 320 (1966). However, we take this opportunity today to reconsider one of our holdings in that case, and accordingly this Court is now of the opinion that Pennsylvania should join the fast growing list of jurisdictions that have eliminated the privity requirement in assumpsit suits by purchasers against remote manufacturers for breach of implied warranty.[3] That aspect of *Miller* must therefore be overruled.

raised below, on the authority of *Sherwood v. Elgart,* 383 Pa. 110, 117 A. 2d 899 (1955), which permits appellees to argue for the first time before this Court an issue upon which an affirmance may be predicated, and permits this Court to then decide that issue, in agreement with or contrary to appellees' contention.

[3] See, e.g., *Gherna v. Ford Motor Co.,* 246 C.A. 2d 639, 55 Cal. Rptr. 94 (1966); *Smith v. Platt Motors, Inc.,* 137 So. 2d 239 (Fla. App. 1962); *State Farm Mut. Auto. Ins. Co. v.*

As far back as 1931 the seeds of discontent were sown in the field of privity when Justice CARDOZO said in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 180, 174 N.E. 441, 445 (1931): "The assault upon the citadel of privity is proceeding in these days apace." Since that historic decision the citadel has all but crumbled to dust in this area of product liability. Courts and scholars alike[4] have recognized that the typical consumer does not deal at arm's length with the party whose product he buys. Rather, he buys from a retail merchant who is usually little more than an economic conduit. It is not the merchant who has defectively manufactured the product. Nor is it usually the merchant who advertises the product on such a large scale

*Anderson-Weber, Inc.*, 252 Iowa 1289, 110 N.W. 2d 449 (1961); *Chandler v. Anchor Serum Co.*, 198 Kan. 571, 426 P. 2d 82 (1967); *Spence v. Three Rivers Builders & Masonry Supply, Inc.*, 353 Mich. 120, 90 N.W. 2d 873 (1958); *Morrow v. Caloric Appliance Corp.*, 372 S.W. 2d 41 (Mo. 1963); *Lang v. General Motors Corp.*, 136 N.W. 2d 805 (N.D. 1965); *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A. 2d 69 (1960); *Randy Knitwear v. American Cyanamid Co.*, 11 N.Y. 2d 5, 226 N.Y.S. 2d 363, 181 N.E. 2d 399 (1962); *General Motors Corp. v. Dodson*, 47 Tenn. App. 438, 338 S.W. 2d 655 (1960); *Ford Motor Co. v. Grimes*, 408 S.W. 2d 313 (Tex. Civ. App. 1966). Cf. *Graham v. John R. Watts & Son*, 238 Ky. 96, 36 S.W. 2d 859 (1931); *Hempstead v. General Fire Extinguisher Corp.*, 269 F. Supp. 109 (D. Del. 1967) (applying Va. law).

[4] See, e.g., Jaeger, Privity of Warranty: Has the Tocsin Sounded? 1 Duquesne L. Rev. 1 (1963); Jaeger, How Strict is the Manufacturer's Liability?; Recent Developments, 48 Marq. L. Rev. 293 (1964-65); Keeton, Products Liability-Liability Without Fault and the Requirement of a Defect, 41 Texas L. Rev. 855 (1963); Prosser, The Fall of the Citadel, 50 Minn. L. Rev. 791 (1966); Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099 (1960); Speidel, The Virginia "Anti-Privity" Statute: Strict Products Liability under the Uniform Commercial Code, 51 Va. L. Rev. 804 (1965); Traynor, The Ways and Meanings of Defective Products and Strict Liability, 32 Tenn. L. Rev. 363 (1965); Note, Strict Products Liability and the Bystander, 64 Colum. L. Rev. 916 (1964).

as to attract consumers. We have in our society literally scores of large, financially responsible manufacturers who place their wares in the stream of commerce not only with the realization, but with the avowed purpose, that these goods will find their way into the hands of the consumer. Only the consumer will use these products; and only the consumer will be injured by them should they prove defective.[5] Yet the law in Pennsylvania continued to permit these manufacturers to escape contractual liability for harm caused consumers by defective merchandise simply because the manufacturer technically did not *sell* directly to the consumer. There was no privity of contract between them. No one denied the *existence* of absolute liability under the code for breach of implied warranty. But this warranty ran not to the injured party, but rather to the middleman who merely sold to the injured party, thus ignoring commercial reality and encouraging multiplicity of litigation.

We realize that prior to the adoption of section 402a of the Restatement of Torts by this Court, see *Webb v. Zern*, 422 Pa. 424, 220 A. 2d 853 (1966), a rather compelling argument against discarding privity in assumpsit actions for breach of warranty existed. Under the Uniform Commercial Code, once a breach of

---

[5] "Consumer" as here used is not restricted only to the "Purchaser" of the defective product, but also extends under section 2-318 of the U.C.C. to others who in fact use the defective goods and whose person or property is injured thereby. The exact limits of the class of such other persons (not the purchaser) who may sue a remote manufacturer in assumpsit, or for that matter anyone in the distributive chain, without a showing of privity involves the question of so-called "horizontal" privity, an issue not before us in the present case. See *Hochgertel v. Canada Dry Corp.*, 409 Pa. 610, 187 A. 2d 575 (1963). The requirements of section 2-318 of the Uniform Commercial Code dealing with "horizontal privity" are discussed more fully at note 8, infra, and accompanying text.

warranty has been shown, the defendant's liability, assuming of course the presence of proximate cause and damages, is absolute. Lack of negligence on the seller's part is no defense. Therefore, prior to the adoption of section 402a, it could be said that to dispense with privity would be to allow recovery in contract without proof of negligence, while requiring a showing of negligence in order to recover for the same wrong against the same defendant if suit were brought in tort. To permit the result of a lawsuit to depend solely on the caption atop plaintiff's complaint is not now, and has never been, a sound resolution of identical controversies.

However, with Pennsylvania's adoption of Restatement 402a, the same demands of legal symmetry which once supported privity now destroy it. Under the Restatement, if an action be commenced in tort by a purchaser of a defective product against a remote manufacturer, recovery may be had without a showing of negligence, and without a showing of privity, for any damage inflicted upon the person or property of the plaintiff as a result of this defective product. The language of the Restatement is both clear and emphatic: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. (2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with

the seller." Thus, in the present case, for example, appellants' complaint alleging that their property (cattle) was damaged (rendered valueless as breeding stock) by virtue of the physical harm caused when these animals ate appellee-Soya's defective feed would have been sufficient to state a valid cause of action had it been captioned "Complaint in Trespass." However, because appellants elected to style their complaint as one in assumpsit for breach of warranty under the code, the requirement of privity would prevent these identical allegations from making out a good cause of action. This dichotomy of result is precisely the same evil which, prior to the Restatement, prevented the abolition of privity. It now compels this abolition.

The majority opinion in *Miller* candidly admits that the policy considerations underlying the imposition of strict liability in tort are precisely the same as those which dictate the abolition of privity in contract actions for breach of warranty.[6] Yet, the Court in *Miller*

---

[6] As the Court said in *Miller*: "Furthermore, we recognize the social policy considerations behind imposing strict liability in tort upon all those who make or market any kind of defective product, notwithstanding an absence of negligence on their part. A similar result would follow from abandoning the requirement of 'privity of contract' in warranty actions." 422 Pa. at 393, 221 A. 2d at 325. These policy considerations are plain: the consumer's inability to protect himself adequately from defectively manufactured goods, see *Jacob E. Decker & Sons, Inc. v. Capps*, 139 Tex. 609, 164 S.W. 2d 828 (1942); the implied assurance on the part of the seller that his goods are safe, see *State Farm Mut. Auto Ins. Co. v. Anderson-Weber, Inc.*, supra note 3; the superior risk bearing ability of the manufacturer, see *Escola v. Coca Cola Bottling Co.*, 24 Cal. 2d 453, 461, 150 P. 2d 436, 440-41 (1944) (TRAYNOR, J., concurring). All of these reasons for the elimination of privity and the imposition of strict liability apply equally to both tort and contract actions.

Merely to compare *Miller v. Preitz* with *Webb v. Zern* (which appears in the official state reports directly after *Miller* and which was decided the same day) serves to underscore the anomaly of

nevertheless retreated from the modern view because of a belief that section 2-318 of the Uniform Commercial Code requires privity in suits against a remote manufacturer. We no longer adhere to such a belief for we are convinced that, on this issue, the code must be co-extensive with Restatement section 402a in the case of product liability.[7]

The explanation offered by the Court in *Miller* for not abolishing "vertical" privity of contract in breach

having identical cases reach opposite results simply because of a pleading label. In *Webb*, a tort action following the Restatement, the party injured by an exploding beer keg recovered against the remote manufacturer; in *Miller*, a contract action decided under the code, the estate of the party killed by an exploding vaporizer could not recover against the remote manufacturer.

[7] The language of the Restatement, speaking as it does of injury to either the individual or his property, appears broad enough to cover practically all of the harm that could befall one due to a defective product. Thus, for example, were one to buy a defective gas range which exploded, ruining the buyer's kitchen, injuring him, and of course necessitating a replacement of the stove itself, all of these three elements of the injury should be compensable. The last, replacing the stove, has been sometimes referred to as "economic loss," i.e., "the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." Comment, 114 U. Pa. L. Rev. 539, 541 (1966). There would seem to be no reason for excluding this measure of damages in an action brought under the Restatement, since the defective product itself is as much "property" as any other possession of the plaintiff that is damaged as a result of the manufacturing flaw. Thus, since the tort action would enable plaintiff to recover for economic loss (the physical harm necessitated by 402a would, ipso facto, be present given the defect in the product which caused the damage), so also should this form of damages be compensable in contract. Contract cases from other jurisdictions dispensing with privity have allowed recovery for all three types of injury: personal injury, *Henningsen v. Bloomfield Motors, Inc.*, supra note 3; injury to plaintiff's property other than the defective article itself, *Morrow v. Caloric Appliance Co.*, supra note 3; and "economic loss," *State Farm Mut. Auto Ins. Co. v. Anderson-Weber, Inc.*, supra note 3.

of warranty actions brought under the U.C.C. was that section 2-318 of the code, limiting the persons benefited by an express or implied warranty to the buyer himself, to members of the buyer's family or household, and to guests in his home, impliedly prohibited any further relaxation of privity strictures. However, although the code sets an absolute limit on those injured parties who may seek shelter under the umbrella of a manufacturer's warranty, section 2-318 says nothing whatsoever about the second problem that confronted the Court in *Miller* and is before us again today. That is: how far back up the distributive chain may an injured party go in seeking to enforce an implied warranty. Must he be satisfied with recovery only against his immediate seller, or may he also hold liable the manufacturer with whom he had no personal contact? In short, given the code's pronouncement on "horizontal privity"[8] (who, besides the purchaser, has a right of action against the manufacturer or seller of a defective product), what, if anything, does this signify concerning the code's complete silence on the issue of "vertical privity" (who, besides the immediate seller, is liable to the consumer for injuries caused by the defective product)?

The answer to this question is provided in the clearest of language by the drafters of the code in comment 3 to section 2-318. Merely to say that our Legislature never enacted the comments into law does not, of course, preclude this Court from examining

---

[8] Our decision today has no impact on "horizontal privity", our holding being confined solely to the issue of whether a purchaser, a member of his family or household, or a guest in his house, may sue the remote manufacturer of a defective product for breach of warranty. Our decision therefore leaves undisturbed *Hochgertel* or any other Pennsylvania decision involving the extent of the class of product *users* entitled to the protection of a seller's or manufactured warranty.

them to ascertain the proper meaning of a statute.[9] The comment recites that: "This section [2-318] expressly includes as beneficiaries within its provisions the family, household, and guests of the purchaser. Beyond this, the section is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain." Thus it is clear beyond peradventure that the drafters of the code never intended 2-318 to set any limits on vertical privity, nor did they intend all changes in the law to come only from the Legislature as suggested, we think erroneously, by the court in *Henry v. John W. Eshelman & Sons*, 209 A. 2d 46 (R.I. 1965); but cf. *Rusch Factors, Inc. v. Levin*, 284 F. Supp. 85 (U.S.D.C., D.R.I. 1968).[10]

---

[9] As originally enacted by Pennsylvania in 1953, section 1-102(3)(f) of the Uniform Commercial Code specifically recognized the official code comments as a permissible aid to construction of the statute. Act of April 6, 1953, P. L. 3, §1-102, 12A P.S. §1-102. Although the 1959 version of the code does not contain this specific reference to the official comments, see Act of October 2, 1959, P. L. 1023, §1, 12A P.S. §1-102 (Supp. 1967), there is still nothing to prevent this Court from using them as an aid in ascertaining the meaning of the code's various sections. See, e.g., *Hochgertel v. Canada Dry Corp.*, 409 Pa. 610, 613, 187 A. 2d 575, 577 (1963), where the same comment cited in the present case was cited by the Court. Moreover, it has long been recognized in Pennsylvania that the reports of commissions appointed to draft legislation may be referred to by courts seeking to divine statutory intent. See *Tarlo's Estate*, 315 Pa. 321, 325, 172 Atl. 139, 140-41 (1934): "The report of a commission appointed to codify the law upon a given subject is entitled to even greater weight than the report of a committee; especially is this so where the legislature enacts the exact language of the commission's draft."

[10] Of course, the Legislature may, if it so chooses, abolish privity. In Virginia, such a statute has already been passed. See *Hempstead v. General Fire Extinguisher Corp.*, 269 F. Supp. 109, 112 (D. Del. 1967) (applying Va. law); Speidel, The Virginia "Anti-Privity" Statute: Strict Products Liability Under the Uniform Commercial Code, 51 Va. L. Rev. 804 (1965).

Moreover, it would not take a comment such as the one cited above to demonstrate that 2-318 does not cover problems of vertical privity. Merely to *read* the language is to demonstrate that the code simply fails to treat this problem. Therefore, just as is the rule for any area of contract law not covered by the code, general principles of law control. See section 1-103. There thus is nothing to prevent this Court from joining in the growing number of jurisdictions which, although bound by the code, have nevertheless judicially abolished vertical privity in breach of warranty cases.

Curiously, the imagined limits on the Court's power under the code to discard vertical privity have not prevented us from eliminating the privity requirement in cases involving tainted food. See, e.g., *Caskie v. Coca-Cola Bottling Co.*, 373 Pa. 614, 96 A. 2d 901 (1953); *Hochgertel v. Canada Dry Corp.*, 409 Pa. 610, 614, 187 A. 2d 575, 578 (1963) (dictum). We now believe that the time has come to recognize that the same policy reasons underlying the food cases also underlie cases involving defective nonedibles which cause injury. When it is considered that continued adherence to the requirements of vertical privity results merely in perpetuating a needless chain of actions whereby each buyer must seek redress for breach of warranty from his own immediate seller until the actual manufacturer is eventually reached, and in memorializing the unwarranted notion that a change in the caption of a complaint can completely alter the result of a lawsuit, our course becomes well marked. Vertical privity can no longer commend itself to this Court.

To retain this tort-contract dichotomy with its haphazard, crazy quilt of exceptions and appendages can only cause Justice VOELKER's language (speaking for the Supreme Court of Michigan when that tribunal abolished the privity requirement) to ring painfully

true for the law of *this* Commonwealth. In commenting on the state of Michigan law under privity it was said: "A court lacking a clear and understandable rule of its own can scarcely be expected to impart it to others. Legal confusion has inevitably resulted. Aggrieved plaintiffs have scarcely known whether to sue in deceit or fraud or for negligence or breach of warranty—or indeed whether it was worthwhile to sue at all." *Spence v. Three Rivers Builders & Masonry Supply, Inc.*, 353 Mich. 120, 129, 90 N.W. 2d 873, 878 (1958). We therefore hold that the lack of privity between appellants and Soya cannot insulate the latter from liability for breach of warranty.

## III.

We now turn to the contention of appellee John Pritts, the merchant who actually blended appellants' feed mixture and sold the tainted feed supplement. Pritts maintains that he cannot be liable under section 2-315 of the Uniform Commercial Code for breach of an implied warranty of fitness for a particular purpose since appellants in no way relied on his skill and judgment in selecting a suitable feed for their cattle. We need not face the question of liability under section 2-315, however, since, under the facts here pleaded, there certainly existed the implied warranty of merchantability under section 2-314; and this warranty was clearly breached by Pritts. As a seller who deals regularly in cattle feed, appellee impliedly warranted that the feed supplement sold to appellants was fit for the ordinary purposes for which such supplement is used. Obviously this supplement was not so fit, since it contained a specific drug that is *never* to be used for breeding cattle.

## IV.

Finally, we must address ourselves to the issue of recoverable damages for this breach of warranty. As we noted earlier in this opinion, the court below erred when it concluded that no *breach of warranty* existed because appellants did not prove that the stilbestrol present in the feed actually caused the cows to abort and the bull to become sterile. The breach of warranty was made out, and appellees shown liable at least for nominal damages, simply by proof that stilbestrol was in fact present in the feed contrary to the formula ordered. However, since there was sufficient evidence to sustain the lower court's finding that the abortions and sterility were not proximately caused by this stilbestrol, we have no choice but to hold that appellants have not demonstrated that particular element of damages.

Nevertheless, because the court below erroneously held that no breach of warranty occurred, it refused to hear any testimony on the second element of damages set forth in appellants' amended complaint wherein it is alleged that the value of the herd has been seriously affected by the cattle buying community's knowledge that these animals ate tainted feed. We believe that under section 2-715(2)(b) of the Uniform Commercial Code[11] appellants should be allowed to recover for the diminution in value of their cattle provided they can establish that this diminution proximately resulted from appellees' breach of warranty. It does not matter whether the cattle lost value because they in fact could not reproduce, or because no one in the com-

---

[11] "§2-715 Buyer's Incidental and Consequential Damages . . . (2) Consequential damages resulting from the seller's breach include . . . (b) injury to person or property proximately resulting from any breach of warranty." Act of October 2, 1959, P. L. 1023, §2, 12A P.S. §2-715 (Supp. 1967).

munity would buy them out of a reasonable fear that the stilbestrol they ate might cause reproductive disorders. For, if either be true, it can fairly be said that appellants' property has been damaged due to the feed sold by appellees.[12] We thus must vacate the judgment below and remand this cause to afford appellants an opportunity to demonstrate, if they can, that their cattle have become unmarketable as breeding animals and that this fact is a proximate result of the ingestation of appellees' feed.

The judgment of the Court of Common Pleas of Washington County is vacated, and the record remanded for further proceedings consistent with this opinion.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.

———

CONCURRING OPINION BY MR. JUSTICE COHEN:

While I concur in the result reached by the majority, I must nevertheless disassociate myself with the views expressed in the majority opinion with respect to the abolition of the privity of contract doctrine in actions instituted for breach of warranty.

I find myself in this position because of the majority's complete lack of judicial restraint in discuss-

———

[12] Recovery for the diminution in value of specific property caused by a refusal of the buying community to assign a market value to that property equal to what it was worth prior to its being affected by seller's defective product must not be confused with recovery for loss of good will to a business caused by community knowledge that seller's defective products were once used or sold by that business. Since the loss of good will cannot be measured by the diminution in value of any specific property belonging to the aggrieved buyer, unlike the present case, such good will loss is too speculative and hence not a compensable element of damages under section 2-715 of the code. *Harry Rubin & Sons, Inc. v. Consolidated Pipe Company of America, Inc.*, 396 Pa. 506, 153 A. 2d 472 (1959).

ing and overturning the long adhered to and well established privity of contract requirements when the question of privity is not a proper subject for review under the procedural posture of this case.

Following the close of plaintiffs' case on liability, counsel for Central Soya and McMillen Feed Division moved for a nonsuit on the basis that the plaintiffs failed to establish privity of contract. The lower court refused the motion and the defendants proceeded to introduce evidence on their behalf. At the close of all of the testimony, defendants failed to move for a directed verdict or for binding instructions. The case was submitted to the trial judge for a determination and a verdict was rendered in favor of the defendants. Plaintiffs moved for a new trial which motion was denied and this appeal followed.

On plaintiffs' appeal defendants seek to raise the propriety of the trial judge's failure to grant defendants' motion for a nonsuit.[1] It is an elementary principle of procedure that one may not appeal from the refusal to grant a nonsuit. *Wallace v. Jameson*, 179 Pa. 98, 36 Atl. 142 (1897); *Crawford & Moyes v. McKinney*, 165 Pa. 605, 30 Atl. 1045 (1895); *Scranton v. Barnes*, 147 Pa. 461, 23 Atl. 777 (1892); *Wray v. Spence*, 145 Pa. 399, 22 Atl. 693 (1891); *Morgan v. Duquesne Borough*, 29 Pa. Superior Ct. 100 (1905). Likewise, the reasons advanced in support of a motion for a nonsuit will not be considered on appeal unless the party raising such questions takes the necessary procedural steps to insure their viability. *Jordan v. Sun Life Assurance Company of Canada*, 366 Pa. 495, 77 A. 2d 631 (1951); *Smith v. Ehler*, 366 Pa. 111, 76

---

[1] The brief for defendants, Central Soya and McMillen Feed Division, raises the privity issue as follows: *"Did the trial judge err in overruling the Motion for a nonsuit by the defendants, Central Soya and McMillen Feed Division?."* (Emphasis supplied)

A. 2d 865 (1950) ; *Liebendofer v. Wilson*, 175 Pa. Superior Ct. 632, 107 A. 2d 133 (1954). Thus the appeal is not from the refusal to grant a nonsuit, but rather is an appeal from a refusal to grant a motion for a directed verdict or a motion for a judgment n.o.v. Here no such steps were taken. The record fails to indicate that defendants after initially moving for a nonsuit took any further steps at the close of all the testimony to preserve their right to argue at least the reasons for the lower court's alleged error in refusing the nonsuit.

The cases are quite clear that once a defendant has elected to offer evidence, it is highly improper for a court to enter a compulsory nonsuit. At the moment defendant introduces testimony, any right to an entry of a compulsory nonsuit ceases to exist. See Act of March 11, 1875, P. L. 6, 12 P.S. §645; *Jordan v. Sun Life Assurance Company of Canada*, supra; *Smith v. Ehler*, supra; and *Liebendofer v. Wilson*, supra.

Since no appeal lies from the refusal to grant a motion for a nonsuit, defendants cannot be heard to raise any issue concerning the propriety of that refusal. If defendants were the recipients of an adverse verdict by the trial judge, it goes without saying that they would be precluded from raising on appeal the failure of the court below to grant the nonsuit. Therefore, it is somewhat inconceivable that as defendants-appellants such issue *could not* be raised but as defendants-appellees it *could* be raised.

Aside from improperly reaching out and deciding an issue not subject to our review under the procedural posture of this case, the majority overturns a matter of great importance to the body of law in this Commonwealth without the benefit of having the merits fully briefed or argued. Plaintiffs, apparently believing that the issue was not properly before the court,

240

never once mentioned in their brief the argument with respect to privity of contract. Moreover, defendants in raising the privity issue at best treated the problem most superficially.[2] Under all these circumstances, I submit the majority should have awaited a "better opportunity" to completely change the traditional doctrine of privity of contract in the breach of warranty area.

[2] It will suffice to quote from defendants' brief the entire text with respect to defendants' substantive analysis of the privity of contract issue:

"The plaintiffs had purchased the feed in question from the defendant, John Pritts, trading as Canonsburg Milling Company. The evidence showed only that the feed had been manufactured or produced by Central Soya from whom it was ultimately acquired by John Pritts. Under these circumstances, the plaintiffs are not entitled to sue Central Soya on the basis of breach of an implied warranty, in that a privity of contract does not exist between them. *Hochgertel v. Canada Dry Corporation*, 409 Pa. 610, 187 A. 2d 575 (1963); *Miller v. Preitz*, 422 Pa. 383, 221 A. 2d 320 (1966). The court erred in not granting the nonsuit and the appeal should thus be stricken as to Central Soya."

This somewhat terse and cursory treatment of the problem is the *only* reference in all the briefs and records filed with our Court, and as such provided the *only* basis upon which the majority acted in unnecessarily and injudiciously deciding a matter not procedurally before us for review.