568 A.2d 948

**SPAGNOL ENTERPRISES, INC., a Corporation, and Delmar Leasing Corporation, Appellee,**

v.

**DIGITAL EQUIPMENT CORPORATION, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 19, 1989.

Filed Dec. 20, 1989.

Reargument Denied Jan. 31, 1990.

Arthur H. Stroyd, Jr., Pittsburgh, for appellant.

Michael J. Seymour, Bethel Park, for appellee.

Before McEWEN, POPOVICH and MONTGOMERY, JJ.

POPOVICH, Judge:

This case involves an appeal from the order [1] of the Court of Common Pleas of Allegheny County awarding damages in favor of the plaintiffs (Spagnol Enterprises, Inc. and Delmar Leasing Corp.) in the amount of $41,105.92 and denying the defendant's (Digital Equipment Corp.'s) motion for judgment n.o.v. and/or a new trial. We affirm.

1. On April 26, 1989, a praecipe to enter judgment in favor of the plaintiffs (Spagnol Enterprises, Inc. and Delmar Leasing Corp.) and against the defendant (Digital Equipment Corp.) in the amount of $41,105.92 was filed by the plaintiffs with the prothonotary.

As was reiterated by this Court in *Babich v. Pittsburgh & New England Trucking Co.*, 386 Pa.Super. 482, 563 A.2d 168, 171 (1989), quoting *Rocker v. Harvey Co.*, 370 Pa.Super. 32, 36, 535 A.2d 1136, 1138 (1988):

> The standard of review of an appellate court when considering an order granting or denying judgment n.o.v. is the same as that used by the trial court; we must determine whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner the benefit of every reasonable inference that can be reasonably drawn from the evidence and rejecting all unfavorable testimony and inferences. Judgment n.o.v. is appropriate only in a clear case where the facts are such that no two reasonable minds could fail to agree that, as a matter of law, the party has failed to make out his case.

Viewed under such a standard, the facts reveal that Arthur J. Spagnol, president of both Spagnol Enterprises Inc. (a corporation operating eight retail lumber yards) and Delmar Leasing Corp. (a company which owned and held real estate), was in the market to update his computer services to get daily inventories of his stock. In an effort to accomplish this task, Spagnol contacted Digital Equipment Corporation's (DEC) sales department and spoke to a Mr. Dunn in March of 1975. Dunn suggested various types of equipment to meet Spagnol's needs and to engage the services of an original equipment maintenance (OEM) company to program the system. Several weeks after this meeting, a representative of an OEM company, Computer Management Resources (CMR), contacted Spagnol and the two met. Nothing came of this meeting because the cost of the Digital equipment Spagnol wanted to purchase was prohibitive.

By mid-August of 1975, the CMR representative advised Spagnol that Digital's cost had been reduced for the equipment he needed. However, before an agreement would be executed, Spagnol wanted to meet with an official at DEC "since the equipment was coming from them." The meet-

ing was held on September 8, 1975, in DEC's office and present were Spagnol, Ron Smith (from CMR) and Josephine Niedbala, who was in charge of OEM sales which Smith worked under in conjunction with DEC. Spagnol understood this relationship to mean that:

> ... any order placed on my behalf with Digital would be placed through her office and that she would handle the delivery and review the proposals of the equipment basically on whether we were in the right direction or wrong direction.

Before Spagnol would sign a contract to purchase the equipment through CMR, he requested a definite delivery date for the merchandise because he "wanted to get on line with [his] inventory for [the] year ending in 1975." Niedbala, according to Spagnol, guaranteed a 30–day delivery date to occur by October 10, 1975. This was confirmed by Niedbala with the main office in Massachusetts. Thereafter, Spagnol executed a contract (dated September 8, 1975) with CMR for the purchase of a model PDP 11–T–35 Digital computer with an RSX–11–M operating system.

When Spagnol received a maintenance contract in the mail from DEC on October 10, 1975, he did not sign it since the system had not yet arrived as promised. He learned that the equipment was not being shipped because CMR could not pay for it. As a result, by letter dated October 22, 1975, Spagnol contacted a Ms. Halpern at Digital (who was in charge of credit at the main office) "offering [his] financial statement so that [he] could get shipment of the computer...." Halpern refused Spagnol's offer. In an effort to resolve this impasse, Spagnol arranged for a "letter of credit" to be issued by his bank. To secure the bank's interest, Spagnol pledged money from the sale of property held by Delmar Leasing Corporation.

A letter of credit was provided by the bank in DEC's name and Delmar Leasing Corporation was the "issuer of the letter of credit guaranteed by [the bank]." Once this document was sent, the equipment was received at Spagnol's business address on the Monday before Thanksgiving

of 1975. After the equipment had been installed by DEC, Spagnol contacted CMR to bring their "programs" and start the system—this occurred December 3, 1975. What followed was a series of events leading to CMR's dismissal on April 30, 1976, for its inability, as initially thought by Spagnol, to program the computer and meet Spagnol's end-of-the-year deadline to have all goods inventoried. To complete the work left undone by CMR, Spagnol hired John B. Allison as a consultant on May 1, 1976, to oversee the data processing operation.

Allison reviewed the work done by CMR and concluded that none of it was salvageable. He also advised Spagnol to change his system to a UNEX (produced by Bell Laboratories) because it was easier to operate and it had an enhanced memory which was lacking in Digital's RSX system. Until the UNEX system arrived, however, Allison used the RSX.

During the first week of October, 1976 Allison experienced "disk" problems in that "the disks were not copying correctly" and this precluded him from retrieving information programmed on the packs. Allison contacted DEC to examine the problem. Even after DEC did its job (by cleaning the disk packs), Allison did not consider the computer to be "a stable system", as evidenced by the fact that in the Fall of 1976 he was "probably having problems twice a week on backups" and DEC had to be called on numerous occasions (20 to 30 times) during this period. On one of these occasions, Spagnol overheard DEC's servicemen saying that the computer had "old drives" of RKO5's instead of the newer RKO5-J. Spagnol contacted DEC and was told he would get the "up-dated drives". Spagnol never believed what he received was the newer parts he had asked for from DEC.

From January through May of 1977, Allison "believed he had a stable system", and he attributed this to cleaning the disk packs and shifting to the UNEX operating system (replacing DEC's RSX-11-M machinery).

In May of 1977, a fire destroyed 80% of Spagnol's building, but the room which housed the computer was not damaged except by smoke. The fire department had covered the equipment with a tarpaulin and it was moved to another room the following day after being left that evening on an unenclosed porch.

Despite the fact that DEC had cancelled its service contract covering the computer after the fire, it did participate in cleaning the equipment to make it operational again. And, for this, DEC was paid on an hourly basis and for any parts which had to be replaced (such as a module—circuit board). Nonetheless, it was DEC's policy to wait a period of 30 days before placing the computer back on its service maintenance agreement, which they did on July 15, 1977.

It was DEC's position that the May, 1977 fire "contaminated" the system and/or the disk packs so as to impair the use of either one. On the other hand, it was the belief of the plaintiffs that the computer was delivered in a defective condition and resulted in the loss of "manhours" in working on and with the piece of equipment that was damaged upon delivery from the manufacturer (DEC). Thus, the plaintiffs wanted to be compensated for the disk packs damaged by the computer upon insertion therein and for the wages paid to employees to program a system that was inoperable until the correct "disk drives" were placed into the system by DEC, which was almost 3 years from the date of purchase.

The court below, because of the plaintiffs' failure to supply the defendant with documents relating to the claim for damages, bifurcated the trial and initially found in favor of the plaintiffs on the question of liability. Thereafter, at a hearing to receive testimony from Spagnol on the question of damages sustained and the manner and method of calculating the same, the court found against the defendant and ordered it to pay over $40,000.00 in damages.

Post-trial motions were filed and denied. Once the trial court's order was reduced to judgment by praecipe to the prothonotary, this appeal followed and raises four is-

sues for our consideration. We shall address them seriatim. The first appears in the "Statement of the Questions Involved" in the defendant's brief at 3 and reads:

> Whether Spagnol and Delmar, in the Absence of Privity with Digital, Can Recover for Breach of an Alleged Warranty?

We begin our analysis with the proposition that in Pennsylvania privity of contract is not a necessary element in a breach of warranty case. This position was enunciated first by our Supreme Court in *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848 (1968). There, the plaintiffs/Kassabs had purchased feed for their cattle from the defendant/Pritts who had previously blended and supplemented the feed with an ingredient manufactured by the defendant/Central Soya. Shortly thereafter the cows in the herd began to abort and the breed bull was pronounced sterile.

It appeared that the feed-supplement contained a drug that induced abortions in cows and sterility in bulls. Also, federal regulations required that warning labels be placed on feed containing the synthetic hormone that it not be given to breeding or dairy animals. No such label appeared on the feed formula sold by Central Soya to Pritt, who, in turn, sold it to the Kassabs.

An action in assumpsit against Pritt and Central Soya was commenced and heard by a judge sitting without a jury. After the presentment of the plaintiffs' case, the trial court issued a ruling in favor of the defendants on the question of liability believing that the amount of drug in the feed could not have caused the abortions and sterility.

On appeal, the Supreme Court took the occasion to eliminate the privity requirement in assumpsit suits by purchasers against remote manufacturers for breach of implied warranty. In doing so, the Court wrote:

> Under the Uniform Commercial Code, once a breach of warranty has been shown, the defendant's liability, as-

suming of course the presence of proximate cause and damages, is absolute.

\* \* \* \* \* \*

... with Pennsylvania's adoption of Restatement 402a, the same demands of legal symmetry which once supported privity now destroy it. Under the Restatement, if an action be commenced in tort by a purchaser of a defective product against a remote manufacturer, recovery may be had without a showing of negligence, and without a showing of privity, for any damage inflicted upon the person or property of the plaintiff as a result of this defective product.

\* \* \* \* \* \*

Thus, in the present case, for example, appellants' complaint alleging that their property (cattle) was damaged (rendered valueless as breeding stock) by virtue of the physical harm caused when these animals ate appellee–Soya's defective feed would have been sufficient to state a valid cause of action....

\* \* \* \* \* \*

The majority opinion in *Miller* [*v. Preitz*, 422 Pa. 383, 221 A.2d 320 (1966)] candidly admits that the policy considerations underlying the imposition of strict liability in tort are precisely the same as those which dictate the abolition of privity in contract actions for breach of privity. Yet, the Court in *Miller* nevertheless retreated from the modern view because of a belief that section 2–318 of the Uniform Commercial Code requires privity in suits against a remote manufacturer. We no longer adhere to such a belief for we are convinced that, on this issue, the code must be coextensive with Restatement section 402a in the case of product liability.[7]

[7] The language of the Restatement, speaking as it does of injury to either the individual or his property, appears broad enough to cover practically all of the harm that could befall one due to a defective product.

432 Pa. at 228–31 & n. 7, 246 A.2d at 853–54 & n. 7 (Footnote omitted).

Moreover, the *Kassab* Court rejected the trial court's position that there was no breach of warranty because the plaintiffs failed to establish that the tainted feed caused any *injury* to their cattle. It was the Court's belief that "the question of injury" went "only" to the amount of damages and did not affect a finding that the contract was breached. Thus, the Court held that the tainted feed constituted a clear breach of the implied warranty of fitness for a particular purpose, and that the lack of privity between the plaintiffs and Soya would not insulate the latter from liability for breach of warranty.

As in *Kassab* where the plaintiffs' business (of breeding and raising dairy animals) was injured by the manufacturer's product (synthetic hormone contaminated feed), the plaintiffs instantly had its business (through the inability to computerize various aspects of the Spagnol Enterprises, Inc. and the needless expenditure of money associated with programming) injured by Digital's defectively manufactured product (computer). And, in the absence of any privity of contract between the plaintiffs and Digital does not undermine a holding, as stated by the trial court, "in favor of the Plaintiffs under the assumpsit count and [under Section 2–314 of] the Uniform Commercial Code" appearing in their complaint.

Albeit the appellant attempts to distinguish the application of *Kassab* to the present case on the basis of the nature of the damages proven, it is clear from this Court's reading of the *Kassab* opinion that it was intended to apply to all breach of warranty cases brought under the warranty provisions of the Uniform Commercial Code for all types of damages, whether they be personal injuries, damage to property or economic loss.

 To the extent that the appellant argues that "there are no reported Pennsylvania cases which have extended warranty to persons (other than, of course, the immediate buyer) who sustained neither personal injury nor damage to property other than the warranted property", we interpret *Kassab* to allow the award of damages to a plaintiff where

injury has been incurred as the result of a defectively manufactured product which in turn results in a needless expenditure of monies in attempting to make the defective product operational and functional so as to be productive in a "business-sense". To hold otherwise, would be to permit a manufacturer to place a product in the stream of the market and plead no liability when the instrument does not conform to the buyer's needs which were known by the manufacturer at the time the item was sold.

Accordingly, because privity is no longer required in suits between manufacturers and consumers, the appellant's claim to the contrary cannot be embraced as the state of the law in this Commonwealth.

In its second issue, the appellant argues that the trial court erred by ignoring disclaimers of warranty and limitations of liability present in the contract of sale. This issue ignores the fact that, as noted by the appellees in their brief at page 11,

> ... there was no written agreement between DEC and Appellees and therefore none of the disclaimers or limitations of liability contained in the contract referred to which was entered between DEC and CMR have any application to the Appellees. Therefore, the warranties [of merchantability and fitness for the purpose sold] ... apply and provide a proper basis for the Trial Court's determination of liability.

We find no fault with the appellees' logic and, therefore, deny the appellant relief.

The remaining two issues need not detain us long. The third claim that the trial court erred in finding a breach and the fourth issue challenging the trial court's award of damages are refuted by the record evidence, a recitation of which appears earlier in this opinion, as well as in the opinion of the trial court. We see no reason to reiterate those facts which have been discussed at length in both writings, and, thus, require no further elaboration in denying the appellant's allegations of trial errors. Accordingly, the appellant's request for a new trial, in the absence of

trial error, is not warranted. See *Graham v. Sky Haven Coal, Inc.*, 386 Pa.Super. 598, 604, 563 A.2d 891, 894 (1989).

Order affirmed.