## Henderson v. Benson-Hartman Motors, Inc.

 

*Ronald W. Crouch,* for plaintiff.

*William E. Stockey,* for defendant Benson-Hartman Motors, Inc.

*Larry K. Elliott,* for defendant Ford Motor Company.

WETTICK, *A.J.,* November 18, 1983—Plaintiffs are Bercon Packaging, Inc., the lessee of a new Lincoln Continental, and Robert W. Henderson, the chairman of Bercon Packaging, who had the use of this automobile for personal and business purposes pursuant to his employment contract. Defendants are Benson-Hartman Motors, Inc. (Benson Lincoln), the automobile dealer from which Bercon Packaging leased the Lincoln, and Ford Motor Company, the manufacturer of the Lincoln. The lease agreement was for 48 months and provided for monthly rental payments of $510.62.

Plaintiffs allege that upon delivery, they discovered major defects which rendered the automobile unsafe and unfit and that defendants failed to remedy these defects within a reasonable time. In this action, plaintiffs seek a refund of their security deposit and the rental payments which they made, consequential and incidental damages, and attorneys' fees, costs, and expenses. Plaintiffs base their claim on the breach of express and implied warranties, the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. §2301 et seq., and the breach of the lease agreement. Defen-

dants have filed preliminary objections in the nature of a demurrer to each count. These preliminary objections are the subject of this opinion and order of the court.

## I.

Plaintiffs base their breach of warranty claim on the express warranties contained in the 1983 Warranty Facts booklet issued by Ford Motor Company and the implied warranty provisions of the Uniform Commercial Code. Defendants contend that this warranty claim should be dismissed because (a) the Uniform Commercial Code's implied warranty protections do not extend to leases, (b) plaintiff corporation is the only party to the lease agreement, so Henderson cannot maintain an action in his individual capacity, and (c) the lease agreement between the dealer and the corporate lessee disclaimed all warranty protections.

## A.

At this stage of the proceedings, we cannot conclude that the Uniform Commercial Code's implied warranty protections do not extend to the four year lease agreement between Bercon Packaging and Benson Lincoln because this transaction appears to closely resemble an installment sales agreement. This lease agreement extends for most of the useful life of the automobile. The payments due under the lease agreement may be almost equal to the full purchase price, with interest, of the automobile under a four year installment sales agreement. Also, unlike typical lease agreements, the responsibility for maintaining the automobile rests with the lessee, taxes are to be paid by the lessee, the lessee must obtain insurance, and in the event of default the lessee pays the remaining installments and receives a credit for the proceeds from the sale of the automobile. In addition, the lease was assigned to Ford

Motor Credit Company on the date that it was accepted by the automobile dealer.

In Pennsylvania the substance of the transaction—and not its legal form—dictates the substantive rights of the parties to the transaction. Commonwealth v. Monumental Properties, Inc., 459 Pa. 450, 329 A.2d 812, 823-4 (1974). Prior to the enactment of the Uniform Commercial Code, the Motor Vehicle Sales Finance Act explicitly extended the Act's protections to bailment lease contracts (Act of June 28, 1947, P.L. 1110, §§2&3, 69 P.S. §§602, 3) and Pennsylvania case law had extended the warranty protections of the Uniform Sales Act, 69 P.S. §124 to leases that resembled installment sales. Hartford Battery Sales Corporation v. Price, 119 Pa. Super. 165, 181 Atl. 95 (1935); Conn v. Hunsberger, 224 Pa. 154, 73 Atl. 324 (1909); Crown Printing Company v. Charles Beck Company, 73 Pa. Super. 419, Atl. (1920); Shannon v. Boggs & Buhl, 124 Pa. Super. 1, 187 Atl. 313 (1936). The Uniform Commercial Code was not intended to alter this case law. Comment 2 to section 2-313 of the code (13 Pa.C.S. §2313) provides:

"Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. They may arise in other appropriate circumstances such as in the case of bailments for hire . . ."

Also, the Pennsylvania Bar Association Notes —1953 to Section 2-102 of the Uniform Commercial Code cite with approval Shannon v. Boggs &

Buhl, supra, which applied the warranty provisions of the Uniform Sales Act to a bailment lease.

Our appellate courts have not decided whether the Uniform Commercial Code's warranty protections will extend to any transactions cast in the form of a lease. However, in related issues the courts have extended protections provided to purchasers to non-sales transactions. In Berkebile v. Brantley Helicopter Corp., 462 Pa. 83, 337 A.2d 893 (1975), the court in discussing the scope of Section 402(a) of the Restatement (Second) of Torts stated:

"The term 'seller' is used generically to include all suppliers of products who, because they are engaged in the business of selling or supplying a product, may be said to have 'undertaken and assumed a special responsibility' toward the consuming public and who are in a position to spread the risk of defective products. (Citation omitted.) The actual form of the transaction of such suppliers, whether by sale, lease or bailment, should not alter their obligations . . . ." 337 A.2d at 898 (fn. 3)

In Francioni v. Gibsonia Truck Corporation, 472 Pa. 362, 372 A.2d 736 (1977), the court extended the strict liability provisions of Section 402(a) to the lessee of a truck stating:

"By the adoption of Section 402(a), that responsibility [of reducing hazards to life and health inherent in defective products that reach the market] was placed on those who, through manufacturing and distribution, intend that products 'reach the market'. (Citations omitted.) While Section 402(a) speaks only in terms of 'sellers', the foregoing policy statement and accompanying citations demonstrate the propriety of extending its application to anyone 'who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, . . .' (Citation omit-

ted.) What is crucial to the rule of strict liability is not the means of marketing but rather the fact of marketing, whether by sale, lease or bailment, for use and consumption by the public." (Citations omitted.) 327 A.2d at 738

This court's conclusion is consistent with the opinion of Judge Louik of this court in Bugay v. Pearl, 2 D.&C. 3d 336 (1976), which extended the warranty provisions of the Uniform Commercial Code to the lease of a ladder and with Industrial Uniform Rental Company, Inc., and Stork Diaper Service, Inc. v. International Harvester Company, 6 Phila. Co. Rep. 143 (1981), which extended the statute of limitations provisions of the Uniform Commercial Code to a claim for economic losses by a lessee of trucks under a three year lease agreement. Also see Grimm v. Scoa Industries, 9 D.&C. 3d 742 (1979); Hoffman v. Misericordia Hospital of Philadelphia, 439 Pa. 501, 267 A.2d 867 (1970).

## B.

Benson Lincoln's contention that no warranty protections may extend to Henderson, the plaintiff corporate officer to whom the plaintiff corporate lessee furnished the car, is without merit. In Kassab v. Central Soya, 432 Pa. 217, 246 A.2d 848 (1968), and Salvador v. Atlantic Steel Boiler Company, 457 Pa. 24, 319 A.2d 903 (1974), the Pennsylvania Supreme Court held that the warranty protections of the Uniform Commercial Code are available to an injured party in the absence of horizontal and vertical privity. While these cases involved personal injury claims, the Supreme Court in Kassab v. Central Soya, supra, stated that the elimination of the privity requirement extends to economic loss.

"The language of the Restatement, speaking as it does of injury to either the individual or his proper-

ty, appears broad enough to cover practically all of the harm that could befall one due to a defective product. Thus, for example, were one to buy a defective gas range which exploded, ruining the buyer's kitchen, injuring him, and of course necessitating a replacement of the stove itself, all of these three elements of the injury should be compensable. The last, replacing the stove, has been sometimes referred to as 'economic loss,' i.e., 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.' Comment, 114 U.Pa.L.Rev. 539, 541 (1966). There would seem to be no reason for excluding this measure of damages in an action brought under the Restatement, since the defective product itself is as much "property" as any other possession of the plaintiff that is damaged as a result of the manufacturing flaw. Thus, since the tort action would enable plaintiff to recover for economic loss (the physical harm necessitated by 402a would, ipso facto, be present given the defect in the product which caused the damage), so also should this form of damages be compensable in contract . . . ." 246 A.2d at 854 (fn. 7)

This court is aware of two common pleas court opinions that have considered this issue. In Lockhart Iron & Steel Company v. Cyclops Corp. (3424 January Term, 1974), Judge Louik of this court permitted plaintiff to maintain a breach of warranty action for economic loss against both the supplier and the manufacturer of defective roofing material. In Toth v. Glessner, 16 D.&C. 3d 338 (1979), the court said that lack of privity does not bar recovery for economic loss and, consequently, permitted the purchaser of a truck to sue the supplier of the vehi-

cle's dump body which had been attached to the truck by the dealer prior to purchase.[1]

## C.

We also reject defendants' contention that all warranties are excluded by paragraph 16 of the lease between Bercon Packaging and Benson Lincoln which reads as follows:

"(16) Warranty: The Lessee may receive a separate written warranty on the Vehicle. Under this lease, however, there is no promise as to the merchantability, suitability or fitness for purpose of the Vehicle. This means that there is no promise that the Vehicle will be fit for use for any particular purpose or even that it will be fit for the normal purpose for which a vehicle is used."

This purported disclaimer of the implied warranties of fitness and merchantability is not effective. Section 2-316(2) of the Uniform Commercial Code (13 Pa.C.S. §2316(b)), which permits a seller to exclude the implied warranties of the code, requires that the writing be conspicuous. Under Section 1-201(10) of the code (13 Pa.C.S. §1201), a writing is conspicuous "when it is so written that a reasonable person against whom it is to operate ought to have noticed it."[2] Paragraph 16 of the lease upon which defendants rely is not conspicuous because it appears on

---

1. Also, the Magnuson-Moss Warranty Act has virtually eliminated the defense of horizontal privity for written warranties. The act provides a cause of action to any "consumer" (15 U.S.C. §2310(d)(1)) and its definition of consumer includes anyone to whom the product is transferred. 15 U.S.C. §2301(3). See Miller and Kanter, Litigation Under Magnuson-Moss: New Opportunities in Private Actions, 13 Uniform Commercial Code Law Journal 10, 21-2 (1980).

2. This section also provides that whether a term or clause is conspicuous or not is for decision by the court.

the second page of the lease in small print and would not come to the attention of the leasee unless he or she read the entire contents of this form lease agreement. See Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House, 298 N.Y.S. 2d 392, 397, 59 Misc. 2d 226 (1969), rev'd on other grounds, 316 N.Y.S. 2d 585, 64 Misc. 2d 910 (1970), and cases cited therein.

Furthermore, the implied warranties of the Uniform Commercial Code are not excluded unless the language of a purported exclusionary clause clearly and unambiguously excludes these warranties. See generally, 3 Anderson 3d, Uniform Commercial Code, §§2-316:12 and 14 (1983). Paragraph 16 of the lease is ambiguous. Its initial sentence provides that the lessee may receive "a separate written warranty on the vehicle" and it thereafter provides that "under this Lease, however, there is no promise as to the merchantability, suitability or fitness for purpose of the Vehicle." This exclusion may mean only that the lessor provides no additional warranties under the lease agreement. It does not clearly state that the lessor is excluding those warranties which normally flow from a transaction involving the sale of a new car.

The separate written warranty to which paragraph 16 of the lease refers is contained in the 1983 Warranty Facts Booklet issued by Ford which the dealer apparently transmitted to plaintiff. This booklet provided that "[y]our Lincoln dealer will perform warranty repairs (parts and labor) at no charge . . . . All we require is that you properly operate, maintain and care for your vehicle and that you return the vehicle for warranty service to *your Selling Dealer's place of business.*" (Emphasis added.) It would appear that the dealer's furnishing plaintiff with this 1983 Warranty Facts Booklet under which the deal-

er is to perform warranty repairs is inconsistent with the disclaimers of all warranties. Ventura v. Ford Motor Corp., 180 N.J. Super. 45, 433 A.2d 801 (1981).

These conclusions are supported by Section 2-316(1) of the Uniform Commercial Code (13 Pa.C.S. §2316(a)) which provides that in construing words claimed to limit warranties, "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other." Because of the reference in the lease to "a separate written warranty" and the reference in the 1983 Warranty Facts Booklet to the dealer performing warranty repairs, this court cannot at this stage of the proceedings conclude that the dealer has disclaimed all warranties. Weiss v. Keystone Mack Sales, Inc., 310 Pa. Super. 425, 456 A.2d 1009, 1011-2 (1983).

Also, the Magnuson-Moss Warranty Act (which applies to this transaction for the reasons set forth at pages 18-26 of this opinion) may bar the dealer from disclaiming the implied warranty of merchantability. Section 108 of the Act (15 U.S.C. §2308) bars a supplier from disclaiming any implied warranty if this supplier has made a written warranty to the consumer:

"(a) No supplier may disclaim or modify (except as provided in subsection (b) of this section) any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product or (2) at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product.

(b) For purposes of this chapter . . . , implied warranties may be limited in duration to the duration of a written warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty.

"(c) A disclaimer, modification or limitation made in violation of this section shall be ineffective for purposes of this chapter and State law."

Section 101(6) of the Act defines a written warranty to include:

"[A]ny undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking . . . ."

As we have previously discussed, the dealer apparently transmitted to the lessee the 1983 Warranty Facts Booklet of Ford which provided that the selling dealer will perform the warranty repairs. Since the Magnuson-Moss Warranty Act's definition of written warranty includes any undertaking in writing by the dealer to repair, replace or take other remedial action with respect to the automobile in the event that it failed to meet the specifications guaranteed by Ford, such an undertaking classifies the dealer as a "supplier [who] makes any written warranty to the consumer" and, consequently, brings the dealer under the provisions of Section 108 of the Magnuson-Moss Warranty Act.[3]

---

3. It makes no difference that the written undertaking is set forth in a booklet issued by Ford if the selling dealer transmitted the booklet to the consumer with the knowledge that the booklet provided for the selling dealer to perform the warranty repairs. Ventura v. Ford Motor Corp., supra.

Ford argues that plaintiffs' claim for damages and consequential damages should be dismissed because its written warranty provides only for repairs and adjustments and expressly excludes consequential damages.[4] In support of this argument, Ford relies on Section 2-719(1)(a) of the Uniform Commercial Code (13 Pa.C.S. §2719(a)(1)) which allows an agreement to limit the remedies of a buyer "to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts," and Section 2-719(3) (13 Pa.C.S. §2719(c)) which permits consequential damages to be excluded. However, Section 2-719(2) provides that a limitation of remedy will not be enforced "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose," and Section 2-719(3) does not permit consequential damages to be excluded if "the limitation or exclusion is unconscionable." At this stage of the proceedings, plaintiffs should be afforded the opportunity to plead and establish that the limitation of remedy and damage provisions of Ford's express warranty are unenforceable because the limitation of conse-

---

4. Plaintiffs contend that we cannot look to the 1983 Warranty Facts Booklet in considering the validity of their claim because this booklet is not attached to plaintiffs' complaint. However, paragraph 7 of Ford's preliminary objections identifies this warranty facts booklet, which is attached to its preliminary objections, as the express warranty which Ford provided and plaintiffs did not file an answer denying this averment. Consequently, in determining the merits of Ford's preliminary objections, we may refer to this warranty fact booklet under the line of cases which has created an exception to the prohibition against a "speaking demurrer" for a preliminary objection which includes the written agreement upon which the plaintiff bases his or her cause of action. Satchell v. Insurance Placement Facility of Pennsylvania, 241 Pa. Super. 287, 361 A.2d 375 (1976).

quential damages is unconscionable and circumstances caused the limited remedy to fail of its essential purpose. See Ventura v. Ford Motor Corp., supra, 433 A.2d at 812 and cases cited therein; Consolidated Data Terminals v. Applied Digital Data Systems, Inc., 708 F.2d 385 (9th Cir., 1983) (51 L. W. 2713).

## II.

Plaintiffs also raise a claim under the Magnuson-Moss Warranty Act. Plaintiffs seek to come under this act because the act eliminates certain privity requirements that state law may recognize (see p. 8 of this opinion), renders unenforceable warranty disclaimer clauses that may be recognized under state law (see pp. 11-12 of this opinion), and permits a court to award expenses, including attorneys' fees, to a consumer damaged by the failure of a party to comply with any obligation under a written or implied warranty (15 U.S.C. §2310(d)).

Defendants contend that any claim under the Magnuson-Moss Warranty Act must be dismissed because the act is inapplicable to the transaction that is the subject of this litigation. According to defendants, the act covers only consumer sales transactions. Therefore, its protections do not extend to the present transaction because (1) this is a transaction between two business enterprises and (2) the transaction involves a lease—and not a sale.

Initially, we consider defendants' contention that the Magnuson-Moss Warranty Act does not reach any transaction in which the consumer is a business. The act's protections extend to "consumers." A consumer is defined as:

"[A] buyer (other than for purposes of resale) of any consumer product, any person to whom such

product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract). 15 U.S.C. §2301(3)[5]

The term "consumer product" is defined as:

[A]ny tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes . . . ."

Also relevant is the definition of consumer product in Regulation 701.1 promulgated by the Federal Trade Commission:

" 'Consumer product' means any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes. . . . Products which are purchased solely for commercial or industrial use are excluded solely for purposes of this part."

and the Federal Trade Commisison's interpretation of this Regulation:

§700.1 Products Covered

"(a) The Act applies to written warranties on tangible personal property which is normally used for personal, family, or household purposes. . . . This means that a product is a 'consumer product' if the use of that type of product is not uncommon. The percentage of sales or the use to which a product is put by any individual buyer is not determinative. For example, products such as automobiles and typewriters which are used for both personal and commercial purposes come within the definition of consumer product. Where it is unclear whether a

---

5. The word "person" includes corporations. 1 U.S.C. §1.

particular product is covered under the definition of consumer product, any ambiguity will be resolved in favor of coverage."

This FTC interpretation of "consumer product" should be followed unless it is plainly erroneous and inconsistent with the legislature or the accompanying regulations. United States v. Larionoff, 431 U.S. 864, 872; 97 S.Ct. 2150, 2155 (1970); Reneau v. Mossy Motors, 622 F.2d 192, 195 (5th Cir., 1980). An interpretation which provides for a determination based on the use commonly made of the product — and not the use made by the party claiming the act's protections — is not clearly erroneous. To the contrary, it is consistent with the Magnuson-Moss Warranty Act's definition which focuses on whether the product "is normally used for personal, family, or household purposes." See Clark and Davis, Beefing Up Product Warranties: A New Dimension in Consumer Protection, 23 Kansas Law Review 605, 607 (1975); Strasser, Magnuson-Moss Warranty Act: An Overview and Comparison with U.C.C. Coverage, Disclaimer, and Remedies in Consumer Warranties, 27 Mercer Law Review, 1111, 1129-30 (1976). In fact, we would be reluctant to adopt an interpretation of "consumer product" that depended on the actual use of the product by the party claiming Magnuson-Moss Warranty Act's protections, because this would unfairly bring within this act's coverage manufacturers of products that would not be expected to be used for personal, family, or household purposes and, consequently, were not marketed as consumer products.

In this case plaintiffs also allege that the automobile is being used by Henderson for personal, family, and household purposes. Consequently, even if defendants' construction of the act as applying only to transactions in which the product is

actually used for personal, family, or household purposes were correct, plaintiffs may still prevail. Balser v. Cessna Aircraft Company, 512 F. Supp. 1217 (N.D., Georgia, 1981); Crume v. Ford Motor Company, 653 P.2d 564 (Oregon Ct. of Appeals, 1982). Also see Walsh v. Ford Motor Credit Company, 113 Misc. 2d 546, 449 N.Y. S.2d 556 (1982).

We next consider whether the Magnuson-Moss Warranty Act applies to a transaction cast in the form of a lease that has most of the characteristics of a sale. We are aware of no cases that have considered this issue.

In support of their position that the Magnuson-Moss Warranty Act is inapplicable, defendants rely on the definition sections of the act which refer to sales, sellers, and buyers:

" 'Consumer' means 'a buyer' of any consumer product (15 U.S.C. §2301(3));

" 'Written warranty' means a written promise 'made in connection with the sale of a consumer product' or an undertaking in writing 'in connection with the sale . . . of any consumer product' to refund, repair, replace or take other remedial action (15 U.S.C. §2301(6));

" 'Implied warranty' means implied warranty arising under State law 'in connection with the sale' of a consumer product (15 U.S.C. §2301(7)).' "

Prior to the enactment of the Magnuson-Moss Warranty Act, warranty protections for consumer goods were governed by the Uniform Commercial Code which had been enacted in 49 states. While the provisions within the Uniform Commercial Code provided for implied warranties of quality in almost every consumer goods transaction, these warranty protections were frequently illusory because of the other provisions within the code

permitting disclaimers of warranties and limitations on remedies and damages.

Prior to the enactment of the Magnuson-Moss Warranty Act, it was common place for the express warranty to take away much more than it gave by offering a very limited remedy while disclaiming all implied warranties.[6] The major purposes of the Magnuson-Moss Warranty Act are to require meaningful disclosure of the scope and limitations of any warranties that are provided, to offer more effective remedies for the breach of these warranties, and to prohibit sellers who offer express warranties from simultaneously denying consumers the implied warranty protections provided by the Uniform Commercial Code. Under the Magnuson-Moss Warranty Act, sellers of consumer goods are not required to offer warranties. But if they choose to offer any express warranties, they must also provide the protections of the implied warranties of the Uniform Commercial Code.

No new federal warranties are created by the Magnuson-Moss Warranty Act. Instead, the act

---

6. The Senate Committee Report on the Magnuson-Moss Warranty Act (Senate Committee on Commerce, S. Rep. No. 93-151, 93rd Cong., 1st Sess. 2 (1975)) discussed the purpose of Section 108(a) of the act as follows:

"This subsection is designed to eliminate the practice of giving an express warranty while simultaneously disclaiming implied warranties. This practice has often had the effect of limiting the rights of the consumer rather than expanding them as he might be led to believe." (p. 21)

A nearly identical statement is contained at page 7722 of the House Committee Report (House Committee on International and Foreign Commerce, H.R. No. 93-1107, 93rd Cong., 2nd Sess. (1974), 4 U.S. Code Cong. & Admin. News 7702 (1974). See Strasser, Magnuson-Moss Warranty Act; An Overview and Comparison with U.C.C. Coverage, Disclaimer, and Remedies in Consumer Warranties, supra, at 1119.

simply builds upon the provisions of the code by modifying the applicabiity and operation of the warranties of quality of Article 2. Clark and Davis, Beefing Up Product Warranties: A New Dimension in Consumer Protection, supra; Strasser, Magnuson-Moss Warranty Act: An Overview and Comparison with U.C.C. Coverage, Disclaimer, and Remedies in Consumer Warranties, supra; Priest, Special Statutes: The Structure and Operation of the Magnuson-Moss Warranty Act, in Economic Regulation and Consumer Welfare: The Federal Commission in the 1970s at 246-249 (K. Clarkson and T. Muris Eds. 1981).

Because the protections of the Magnuson-Moss Warranty Act are so intertwined with and dependent upon the warranty provisions of the Uniform Commercial Code, the Magnuson-Moss Warranty Act should be construed to reach the same consumer transactions that are covered by the code. A broader construction would make no sense because the Magnuson-Moss Warranty Act provides virtually no protections in transactions beyond the scope of the Uniform Commercial Code. A narrower construction would be inconsistent with the purposes of the legislation of providing more meaningful protections to consumers entitled to the warranty protections of the Uniform Commercial Code. Consequently, we will extend the Magnuson-Moss Warranty Act to those "leasehold" transactions that are generally recognized to be within the coverage of the code.

Prior to the adoption of the Magnuson-Moss Warranty Act, the issue of whether the warranty provisions of the Uniform Commercial Code apply to leases of personal property had been extensively litigated and the overwhelming majority of cases had applied its implied warranties to long-term lease

agreements. 1A U.C.C.R.S. Case Digest §2102.3; Annotations; What Constitutes a Transaction, a Contract for Sale, or a Sale Within the Scope of U.C.C. Article 2, 4 A.L.R.. 4th 85 (1981); Application of Warranty Provisions of Uniform Commercial Code to Bailments, 48 A.L.R. 3d 668 (1973). The landmark cases supporting this position include Cintrone v. Hertz Truck Leasing and Rental Service, 45 N.J. 434, 212 A.2d 769 (1965), which applied the implied warranty provisions of the Uniform Commercial Code to long-term leases of trucks; Sawyer v. Pioneer Leasing Corp., 244 Ark. 943, 428 S.W. 2d 46 (1968), which applied Article 2's provisions to a five year lease of an ice machine; Hertz Commercial Leasing Corp. v. Transaction Credit Clearinghouse, supra, which extended the warranty provisions to five year leases of commercial equipment; and Glenn Dick Equipment Company v. Galey Construction, Inc., 97 Idaho 216, 541 P.2d 1184 (1975), which applies the code's provisions to a short-term lease with an option to purchase. Also see Mid-Continent Refrigerator Company v. Way, 208 S.E. 2d 31 (South Carolina Supreme Court, 1974). The area of dispute generally concerned the applicability of the warranty protections to the short-term lease, an issue that is not relevant to the present case.

These cases applying the warranty provisions frequently rejected the approach that the Uniform Commercial Code applies to all chattel leases, stating that the issue is whether the transaction is sufficiently analogous to a sale. See, e.g., Redfern Meats, Inc. v. Hertz Corp., 134 Ga. App. 381, 215 S.E. 2d 10, 16-17 (1975). A typical example of the rationale of the various courts for applying the implied warranty protections to long-term chattel leases is the court's explanation in Hertz Commercial Leasing

Corp. v. Transportation Credit Clearing House, supra, at 298 N.Y.S. 2d 395:

"Equipment leasing is a recent device whereby users of goods are enabled to have sole and exclusive use thereof for such periods of time as are economically beneficial to them at advantageous costs. It has become a widely used substitute for purchase, with the lessor, in economic reality, taking the place of a financing agency and the lessee paying the equivalent of the full purchase price, plus interest, within the minimum lease period. The lessee, in effect, is the true purchaser. Under present tax laws, which appear to be the basis on which these arrangements are made, it is foreseeable that this method of transferring the right to use goods will encompass a sizeable portion of the volume of commercial transactions which have the use of goods (rather than their consumption) as their immediate economic end.

"In view of the great volume of commercial transactions which are entered into by the device of a lease, rather than a sale, it would be anomalous if this large body of commercial transactions were subject to different rules of law than other commercial transactions which tend to the identical economic result." p. 395

These early cases relied heavily on Farnsworth, Implied Warranties of Quality in Non-Sales Cases, 57 Colum. L. Rev. 653 (1957). Other authorities which had expressed the same view that there should be little or no differentiation under Article 2 of the Uniform Commercial Code between sales and at least long-term chattel leases include Hart and Willier, Forms and Procedures Under the Uniform Commercial Code § 12.02, p. 1-64 (1966); 1 Anderson, Uniform Commercial Code § § 2-102:4 and 5 (2d Ed., 1970); Murray, Under the Spreading Anal-

ogy of Article 2 of the Uniform Commercial Code, 39 Fordham L. Rev. 447 (1971); and Comment, The Extension of the Warranty Protection to Code Transactions 10 B.C. Ind. and Com. L. Rev. 127 (1968).

Recent appellate court cases continue to reach the same result. See, generally, Hertz Commercial Leasing Corp. v. Joseph, 641 S.W. 2d 753 (Kentucky Court of Appeals, 1982); Walter E. Heller & Company, Inc. v. Convalescent Home, 49 Ill. App. 3d 213, 365 N.E. 2d 1285 (1977); and Interstate Industrial Uniform Rental Service, Inc. v. F. R. Lepege Bakery, Inc., 413 A.2d 516 (Maine Supreme Court, 1980).

This court's decision to extend the Magnuson-Moss Warranty Act to those lease agreements that are generally recognized to be within the coverage of the code is also supported by the same policy considerations that caused the courts to extend the Uniform Commercial Code's warranty protections to those transactions. The purpose of the Magnuson-Moss Warranty Act is to provide increased warranty protections to consumers obtaining goods from merchants. A clause in a sales agreement waiving the act's protections would not be enforced. Congress did not intend to permit a manufacturer or merchant of consumer goods to achieve this same result by using contractual forms which purport to place the transaction outside the act.

The Internal Revenue Code provides an investment credit for property owned and leased by a taxpayer to others but not for property purchased for resale. The question of whether a 36 month lease agreement covering a new automobile would be treated as a lease or a sale for purposes of these In-

ternal Revenue Code provisions was considered in Swift Dodge v. Commissioner of Internal Revenue, 692 F.2d 651 (9th Cir., 1982). The court held that the characterization of the transaction would be controlled by the substantive provisions of the agreement and the parties' conduct, rather than by the particular terminology used in the agrement. Under this test it concluded that since the allocation of duties in the agreement was not different from what it would be under a conditional sales contract, the transaction would be treated as a sale and, therefore, the automobile would not be deemed to be property owned by the auto dealer and leased to others. The same anlysis should be applied in determining whether a transaction comes within the scope of the Magnuson-Moss Warranty Act. Otherwise, we would allow the manufacturers and merchants whom Congress sought to regulate to avoid the requirements of the act simply by their choice of terminology in the agreement transferring consumer goods.

### III.

We sustain defendant Ford Motor Company's preliminary objections to Count III of plaintiffs' complaint because Ford is not a party to the lease agreement.

## ORDER OF COURT

On this November 18, 1983, it is hereby ordered that (1) defendant Ford Motor Company's preliminary objections in the nature of a demurrer to Count III of plaintiffs' complaint are sustained and this count is dismissed as to this defendant and (2) the remaining preliminary objections of both defendants are overruled.