J-A20040-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| DR. JOHN D. HARDING AND DR. LINDA K. KRUUS, H/W | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| THE CUTLER GROUP, INC. D/B/A THE DAVID CUTLER GROUP | |
| Appellant | No. 135 EDA 2015 |

Appeal from the Judgment Entered on December 29, 2014
In the Court of Common Pleas of Montgomery County
Civil Division at No.: 2010-24681

BEFORE:  DONOHUE, J., SHOGAN, J., and WECHT, J.

MEMORANDUM BY WECHT, J.:                    **FILED NOVEMBER 10, 2015**

The Cutler Group, Inc., D/B/A/ the David Cutler Group, appeals the December 29, 2014 judgment in favor of Dr. John Harding and his wife, Dr. Linda Kruus (collectively "the Hardings").  For the reasons discussed herein, we conclude that the trial court erred in awarding damages to the Hardings under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa.C.S. § 201, *et seq*.  Hence, we reverse in part and affirm in part.

The trial court summarized the factual and procedural history of this case as follows:

> [The Hardings] are the owners of a home located at 2424 April Drive, Jamison, Pennsylvania ("the home").  The home is a two-story structure located in Warwick Township, Bucks County.  The front of the home faces south and has a brick façade.  The side

and rear walls have stucco façades. . . . The Cutler Group, Inc. is a business entity [that] constructed the [home].

The parties signed an Agreement of Sale for the [home] on March 15, 2008. Additionally, the parties signed a Limited Warranty Home Warranty Agreement ("the Warranty") dated June 30, 2008, which provided, in pertinent part, as follows:

1. . . . Seller warrants said premises to be free of structural or mechanical defects for a period of one (1) year from the date of settlement, and Seller shall be responsible for the correction of such defects found at the premises during said one (1)-year period, and shall act with reasonable promptness to repair, reconstruct or otherwise correct at Seller's sole discretion such defects upon receipt of notice in writing from Buyer of any such structural or mechanical defects, and after Seller inspects same at said premises.

2. <u>Coverage During Second Year</u>. During the second year after the commencement date, the Builder continues to warrant that the home will be free from <u>major construction defects</u> and that the plumbing, electrical, heating and cooling systems will perform according to the Approved Standards, unless their failure is the result of a defect in an appliance, fixture, or item of equipment. A major construction defect is actual damage to the load-bearing portion of the home (including damage due to subsidence, expansion or lateral movement of soil from causes other than floor [*sic*] or earthquake) which affects its load-bearing function and which vitally affects (or is imminently likely to produce a vita [*sic*] effect on) the use of the home for residential purposes.

3. In addition, Seller specifically warrants as follows, but not in limitation of the general warranty stated above:

a. Your home has been constructed in accordance with the accepted home-building practice of this locality and, prior to delivery, has been inspected by our trained personnel as well as the building inspector.

Paragraph 12 of the Exclusions section of the Warranty provides that [the Cutler Group] will not make any reimbursements for work completed by an outside contractor unless pre-authorized in writing by the Cutler Group.

Approximately ninety (90) days after the date of settlement/commencement on June 30, 2008, the Hardings provided [the Cutler Group] with a written "punch list" of problems with their new home. The ninety (90)-day punch list identified, *inter alia*, water intrusion and leaking in the family room (rear of the home) and stucco cracking. In response, [the Cutler Group] came to the home on more than one occasion to caulk the leaking window to the right of the fireplace in the rear of the home.

In September 2009, the Hardings notified [the Cutler Group] of discoloration around a window and ceiling marks in one of the bedrooms. [The Cutler Group] came to the home and removed the window, re-caulked, and then replaced the window. [The Hardings] notified [the Cutler Group] about concerning odors, and [the Cutler Group] came to the home again and painted over markings on the wall. [The Hardings] also reported concerns of mold growth to [the Cutler Group] because the smell continued to intensify.

In March 2010, the home experienced severe water intrusion in the family room by the window that had been caulked previously. Water was "flowing" into the basement. The Hardings used pans, buckets, and towels to collect the water and clean up the mess. On March 19, 2010, [the Cutler Group] sent a contractor, Justin McCarty, to the home to test the moisture levels in the wall of the family room surrounding the leaky window. McCarty stated that the moisture readings on all three sides of the family room showed high moisture measurements. McCarty stated that the high moisture level was concerning because it meant the wood behind the walls could be breaking down and/or that there would be mold growth as well. The Hardings were particularly [concerned about] the potential [for] mold growth since their young son, Will, suffered from asthma and other allergies.

Linda [Kruus] contacted an air quality specialist called NAL to investigate the odor in the two bedrooms and the front living room. By the time the Hardings contacted NAL, the worsening odor was also apparent in the front living room and the bedroom of the Hardings' two-year-old son. After NAL completed its evaluation, [Dr. Kruus] contacted Eric Labor, at the Cutler Group, and pleaded for his help. Mr. Labor provided [the Hardings] with contact information for David Burkhardt, an air quality expert, even though "he wasn't supposed to do this."

- 3 -

David Burkhardt, an industrial hygienist and indoor air quality specialist employed by Eagle Industrial, visited the home on April 28, 2010, to conduct an inspection and test for moisture. Mr. Burkhardt conducted approximately sixty probes and found elevated moisture readings on the three outside [walls] of the home that had stucco cladding. The leaks originating from outside the home had begun to saturate the Oriented Strand Board (OSB) wall sheathing and the moisture could be detected on the interior surface of the wall sheathing. Elevated moisture readings on the inside of the wall sheathing typically indicate even higher moisture readings on the outside of the wall because water moves from the outside to the inside. Mr. Burkhardt found "excessive moisture" on the inside of the wall sheathing . . . in the office and the family room. Evidence of water damage also was visible in the basement of the home.

Mr. Burkhardt found the side walls of the home had the following elevated moisture levels when measured from the outside:

a. The right side wall of the family room contained an elevated moisture level of greater than 40%

b. The left side wall at the kitchen contained an elevated moisture level of greater than 40%

c. The left side wall at the master bedroom contained elevated moisture levels of 21.3%, 37.7%, and 29.3%

d. The first-floor bathroom on the right side of the house contained an elevated moisture level of 31.3%

e. The right side of the house near the rear corner contained an elevated moisture level of 38.8%

f. The right front side of the house near the electric meter contained elevated moisture levels of 23.3%, 35.3%, and greater than 40%

While all wood products have some level of moisture, a level of approximately 10% is expected in the building materials in a constructed home. A moisture reading of 15% or less is considered acceptable in wood. A moisture reading in the range of 20% is wet enough to cause deterioration of the building materials and mold growth. The Indoor Air Quality Association, American Industrial Hygiene Association, and the Environmental Protection Agency all consider wood building materials with a

moisture content of 20% to be "wet." A moisture reading of 40% is considered "excessively wet." Multiple locations of the home had readings that registered [in excess of] 40% moisture content. Mr. Burkhardt's expert opinion was that removal of all of the stucco was necessary in order to curtail mold growth and to prevent further damage to the structure. Mr. Burkhardt testified as follows:

> As a result of our findings, I've outlined a recommended plan of action, which starts on Page 9 of the report. And this action plan was designed following accepted mold and water damage remediation practices relative to the protection of the interior of the house, so you don't get contamination and distribution of debris as the work is done.

> Based on the findings of wet building materials on all three sides of the house, my recommendation was . . . [to remove] the stucco, the wire lath, and the building wrap . . . from all areas that have stucco to expose the oriented strand board, and at that point, to determine the extent of the water damage to the oriented strand board; [and] to remove water-damaged oriented strand board and to clean the wall cavities as needed based upon this further deconstruction and investigation that would take place.

> The evaluations frequently reveal that there is water damage, mold growth, and structural deterioration of the framing members of the house. But this is something that you can't determine until the removal process is started.

Additionally, Burkhardt opined that, left unabated, the mold growth and deterioration at the Hardings' home would worsen every day.

In April 2010, [the Cutler Group] agreed to submit a work order to fix the family room bump out, but only if [the Hardings] executed a Confidentiality Agreement. In June 2010, the [Hardings] provided [the Cutler Group] with copies of an expert reports indicating water intrusion in the home. In August 2010, [the Cutler Group] wrote to [the Hardings] and rejected the experts' findings of moisture levels in the home. [The Cutler Group] did not send a representative to inspect the home after being provided with the reports . . . .

From May 2010 until the completion of the remediation by [the Hardings] in November 2010, [the Hardings] occupied only two of the four bedrooms in their new home, with four persons occupying the master bedroom due to moisture and odors relating to water leaks in two of the bedrooms.

[The Hardings] hired Mark Werther, a forensic architect, to evaluate the construction of the home. He testified that the OSB was "badly damaged," that the thickness of the stucco was in violation of the applicable Code, that a window in the area of a water leak had an incomplete expansion bead and was not installed in accordance with the window manufacturer's instructions, and that there was excessive stapling through the flashing, which caused moisture to get into the OSB and caused "penetration of the water to affect the structure."

[The Hardings] also hired Jerry Yedinak, an expert in the field of stucco installation, to inspect the stucco on their home. He testified that the stucco siding at the Hardings' residence did not include expansion joints, weep screeds, proper window sealants or drainage plains, and that the stucco was not properly installed.

The "accepted home building practice" referenced in the Warranty in effect for Warwick Township at the time [the Cutler Group] built the Hardings' home is set forth in the 2003 International Residential Code (IRC). R703.1 of the IRC sets forth that "[e]xterior walls shall provide the building with a weather-resistant exterior wall envelope." The Hardings' home did not include a weather-resistant exterior wall envelope when [the Cutler Group] sold the home to the Hardings. [The Cutler Group] admitted that the entire rear façade of the home, and portions of the sides of the home, had water damage and needed to be remediated.

On June 28, 2010, [the Hardings] notified [the Cutler Group] of the expert reports they obtained recommending the removal of stucco and remediation of the back and side walls of the home. On August 16, 2010, the Hardings' counsel wrote to the Cutler Group and advised that Dugan Construction would begin removal of the stucco and other work on the home on August 25, 2010.[1] In response, [the Cutler Group] offered to remove the rear wall of the home and locate the moisture to determine if the side walls needed to be remediated. [The Hardings] rejected this proposal. [The Cutler Group] then offered to remove all three

- 6 -

walls of stucco with the caveat that [the Hardings] would reimburse [the Cutler Group] for the remediation costs of the sides of the property if they showed no sign of water infiltration. Ultimately, this offer was rejected, and Dugan Construction began to repair the home in late October 2010. [The Cutler Group] never tested for the source of the water intrusion in the two years between the time that [the Hardings] first reported the water intrusion in September 2008 and the start of the repairs in October 2010. [The Cutler Group] refused to pay for Dugan Construction to remove the stucco [from] all three sides of the home. [The Hardings] paid Dugan Construction $75,802.50 to repair the defects to the home.

> [1] Dugan Construction did not begin to work on the home on August 25, 2010, because the Hardings delayed the work to give [the Cutler Group] time to correct the defects.

During the course of the negotiations between [the Hardings] and [the Cutler Group, the Hardings] filed a complaint against [the Cutler Group] on August 19, 2010, alleging breach of contract/warranty and violation of the [UTPCPL]. A three day bench trial was conducted . . . on January 13-15, 2014. On the second day of trial, [the Hardings] filed a motion for leave to file an amended complaint in order to clarify their claims and conform the pleadings to the evidence presented [at trial]. On February 7, 2014, the [trial] court granted [the Hardings'] motion, . . . and [the Hardings] filed an amended complaint on February 14, 2014. The amended complaint added the following sentence to the original complaint: "Further, [the Cutler Group's] failure to honor the terms of the warranty is a violation of § 201-2(xiv) of the UTPCPL."

Trial Court Opinion ("T.C.O."), 2/18/2015, at 1-8 (minor modifications for clarity; citations to notes of testimony omitted).

On March 4, 2014, the trial court entered its findings of fact and its decision. The trial court held that the Cutler Group was liable to the Hardings for breach of contract/warranty (count one of the Hardings' amended complaint), and awarded the Hardings damages of $78,827.50.

The court also found that the Cutler Group was liable to the Hardings' under the UTPCPL (count two of the Hardings' amended complaint), and awarded the Hardings damages of $157,655.00. On March 12, 2014, the Cutler Group filed a post-trial motion, wherein it sought a new trial or, in the alternative, a remittitur striking the damages awarded under the UTPCPL. On March 14, 2014, the Hardings filed a post-trial motion seeking attorneys' fees and costs. On June 12, 2014, following a hearing, the trial court denied both of those motions.

On July 10, 2014, the Cutler Group filed a notice of appeal. On July 18, 2014, the Hardings also filed a notice of appeal. On July 29, 2014, the trial court requested that this Court remand both cases so that the trial court could vacate the judgment and enter a revised order. On September 8, 2014, we entered an order remanding the cases to the trial court and relinquishing jurisdiction. *See* Order, 9/8/2014, at 1.

On October 6, 2014, the trial court entered a revised decision, which reduced the statutory damages awarded to the Hardings under the UTPCPL from $157,655.00 to $78,827.50. The trial court also awarded the Hardings $80,347.06 for attorneys' fees and costs. The Cutler Group filed a post-trial motion, which the trial court denied on December 5, 2014. The trial court entered judgment on December 29, 2014.

On December 30, 2014, the Cutler Group filed a notice of appeal. On December 31, 2014, the trial court ordered the Cutler Group to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

The Cutler Group timely complied. On February 18, 2015, the trial court filed a Pa.R.A.P. 1925(a) opinion.

The Cutler Group presents six issues for our consideration:

1. Did the trial court commit an error of law and abuse its discretion by finding the [Hardings] were not required to establish the common[-]law elements of fraud in order to support their claims under the [UTPCPL] and by finding [the Cutler Group] violated the UTPCPL by breaching the warranty and failing to construct the subject home in accordance with home building[-]practices in [the Hardings'] locality?

2. Is a decision which awards statutory damages and attorney's fees under the [UTPCPL] an error of law and an abuse of discretion when the record does not support a finding that [the Cutler Group] violated the act?

3. Did the trial court commit an error of law and abuse its discretion by allowing [the Hardings] to amend their complaint and add an additional theory of recovery under the provisions of the [UTPCPL] following the close of trial?

4. Did the trial court commit an error of law and abuse its discretion by finding that [the Cutler Group] was liable to the [Hardings] under the [UTPCPL] under the catch[-]all provision?

5. Did the trial court commit an error of law and abuse its discretion by changing its findings of fact and decision in its order and decision of October 3, 2014, and issuing a subsequent opinion of February 18, 2015, admitting to an error of law?

6. Did the trial court abused [*sic*] its discretion and committed [*sic*] an error of law by finding that [the Cutler Group] breached its limited warranty with the [Hardings] where such a finding was clearly against the weight of the evidence produced at trial and shocking to the conscious[*sic*]?

Brief for the Cutler Group at 7-8 (capitalization modified).[1]

In their first and second issues, the Cutler Group challenges the trial court's finding that "the [Hardings] were not required to establish the common[-]law elements of fraud in order to support their claims under the [UTPCPL]."[2]  Brief for the Cutler Group at 27 (capitalization modified).  In its Rule 1925 opinion, the trial court agreed that the Hardings' UTPCPL claim "require[d] a showing of common[-]law fraud."  T.C.O. at 18.  Because the Hardings did not prove the elements of common-law fraud, the trial court conceded that it erred in awarding the Hardings statutory damages and attorney's fees pursuant to the UTPCPL.  *Id.*  For the reasons that follow, we disagree that the UTPCPL requires plaintiffs to demonstrate **all** of the elements of common-law fraud; nonetheless, we agree that the trial evidence in support of the Hardings' UTPCPL claims was insufficient as a matter of law.

Whether the UTPCPL requires that plaintiffs plead and prove the elements of common-law fraud is an issue of statutory interpretation, a question of law.  Accordingly, our standard of review is *de novo* and our

_____

[1]    We have reordered the Cutler Group's issues for ease of disposition.

[2]    A claim for common-law fraud requires a plaintiff to demonstrate: (1) a representation; (2) material to the transaction at issue; (3) made falsely, with; (4) either knowledge or reckless disregard of its falsity; (5) with the intent to mislead another person or induce justifiable reliance; and (6) an injury caused by the reliance.  ***Bortz v. Noon***, 729 A.2d 555, 560 (Pa. 1999).

scope of review is plenary. *See Stoloff v. Neiman Marcus Group, Inc.*, 24 A.3d 366, 369 (Pa. Super. 2011). Generally, with respect to statutes, "the object of all interpretation and construction is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). "Because the legislature is presumed to have intended to avoid mere surplusage, every word, sentence, and provision of a statute must be given effect." *Allegheny Cty. Sportsmen's League v. Rendell*, 860 A.2d 10, 19 (Pa. 2004). We also may assume that the legislature does not intend a result that is absurd, unreasonable, or impossible of execution. 1 Pa.C.S. § 1922.

Pennsylvania's consumer protection law, the UTPCPL, proscribes "unfair methods of competition" and "unfair or deceptive acts or practices" in connection with trade or commerce.[3] 73 Pa.C.S. § 201-3. Upon a finding of liability under the UTPCPL, the trial court may award "up to three times the actual damages sustained" and any additional relief it deems proper. 73 Pa.C.S. § 201-9.2. Subsection 201-2(4) enumerates twenty specific unfair methods of competition and unfair or deceptive acts or practices, and includes a catchall provision. Relevant to the case *sub judice*, the General Assembly has defined "unfair methods of competition" and "unfair or deceptive acts or practices" to include "[f]ailing to comply with the terms of

---

[3] The UTPCPL also applies to residential real estate transactions. *See Growall v. Maietta*, 931 A.2d 667, 676 (Pa. Super. 2007).

any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made." 73 Pa.C.S. § 201-2(4)(xiv).

Since the enactment of the UTPCPL in 1968, Pennsylvania courts have struggled to define which UTPCPL claims, if any, require proof of each of the elements of common-law fraud. **Compare Ross v. Foremost Ins. Co.**, 998 A.2d 648, 654 (Pa. Super. 2010) ("In order to establish a violation of [the UTPCPL's] catch[-]all provision, a plaintiff must prove all of the elements of common-law fraud."); **with Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC**, 40 A.3d 145 (Pa. Super. 2012) (holding that a plaintiff need not prove all of the elements of common law fraud in order to establish a violation of the UTPCPL's catch-all provision); **see also DiLucido v. Terminix Int'l, Inc.**, 676 A.2d 1237, 1239 (Pa. Super. 1996), *abrogated by* **Toy v. Metro. Life Ins. Co.**, 928 A.2d 186 (Pa. 2007). This question is complicated by the fact that most of the practices proscribed by subsection 201-2(4) involve fraudulent or deceptive conduct, **see e.g.**, 73 Pa.C.S. § 201-2(4)(vi) ("Representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand"), but a few do not. **See, e.g.**, 73 Pa.C.S. § 201-2(4)(xviii) (prohibiting confession-of-judgment clauses in consumer contracts); 73 Pa.C.S. § 201-2(4)(xii) (prohibiting certain buyer-referral agreements).

Although no appellate court in Pennsylvania has considered whether subsection 201-2(4)(xiv) of the UTPCPL requires plaintiffs to plead and prove

each of the elements of common law fraud, it is well-settled that private parties bringing claims under the UTPCPL must demonstrate that they have standing to do so. "The [UTPCPL] creates a private right of action in persons upon whom unfair methods of competition and unfair or deceptive acts or practices are employed and who[,] as a result, sustain an ascertainable loss." *Toy*, 928 A.2d 186, 191 (Pa. 2007); *see* 73 Pa.C.S. § 201-9.2.

The Pennsylvania Supreme Court repeatedly has held that, due to the causation element in the UTPCPL's standing provision, *see* 73 Pa.C.S. § 201-9.2(a) (allowing for actions by private plaintiffs who suffer a loss "as a result of" the defendant's deception), a private plaintiff pursuing a claim under the statute must demonstrate the justifiable reliance element of common-law fraud. *See Schwartz v. Rockey*, 932 A.2d 885, 897 n.16 (Pa. 2007) ("[T]he justifiable reliance criterion derives from the causation requirement[,] which is express on the face of section 9.2."); *Toy*, 928 A.2d at 202 ("[A] plaintiff alleging violations of the Consumer Protection Law must prove justifiable reliance."); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004) ("To bring a private cause of action under the [UTPCPL], a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance."); *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001) ("The statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss as a result of the defendant's prohibited action. That means . . . a plaintiff must allege reliance.").

Both the Cutler Group and the trial court cite *Toy* and *Weinberg*, which they interpret to require that a plaintiff prove common-law fraud in order to prevail on a claim under the UTPCPL. This is incorrect. Those cases require only that private plaintiffs demonstrate one element of common-law fraud, **justifiable reliance**, in order to bring a claim under the UTPCPL. *See Toy*, 928 A.2d at 208 ("[T]his Court's decision in *Weinberg* . . . stands for the proposition that that a plaintiff alleging violations of the [UTPCPL] must prove the common[-]law fraud element of justifiable reliance.").

Notwithstanding *Toy* and *Weinberg*, the Hardings maintain that "justifiable reliance cannot be an element of a claim under [subsection] 201-2(4)(xiv)." Brief for the Hardings at 28. They reason that such an interpretation of the statute would yield an absurd result because subsection 201-2(4)(xiv) "makes it a violation [of the UTPCPL] to fail to comply with a written guarantee or warranty given to the buyer <u>after</u> the transaction was made." *Id.* at 27 (emphasis in original). The Hardings question how a plaintiff could rely justifiably upon a written warranty that they received only after the transaction was completed, and they maintain that the General Assembly could not have intended to draft such an illogical provision.

The Hardings misunderstand the UTPCPL's justifiable reliance requirement. A private plaintiff is not required to demonstrate that the written guarantee or warranty justifiably induced him to **purchase** goods or services. Instead, the plaintiff must demonstrate that he justifiably relied upon the defendant's wrongful conduct or representation and that he

suffered some harm as a result of that reliance. *See Weinberg*, 777 A.2d at 446 ("The statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss *as a result* of the defendant's prohibited action." (emphasis in original)). Furthermore, the justifiable reliance requirement does not render the entire statute illogical, because it applies only in actions brought by private plaintiffs. The statute allows the Attorney General to bring an action on behalf of the Commonwealth without demonstrating justifiable reliance. *See* 73 Pa.C.S. § 201-4. In any event, *Toy* and *Weinberg* are binding precedent, which this Court must apply without regard to the rules of statutory construction.

Although the Cutler Group overstates the dictates of *Toy* and *Weinberg*, its conclusion that the trial court erred in awarding damages to the Hardings under the UTPCPL nevertheless is correct. Because the Hardings neither alleged in their complaint, nor proved at trial, justifiable reliance, their UTPCPL claims must fail as a matter of law. Accordingly, we reverse the trial court's finding of liability and award of damages and attorneys' fees under the UTPCPL.

In their third issue, the Cutler Group argues that the trial court abused its discretion in allowing the Hardings to amend their complaint to include a claim that the Cutler Group was liable pursuant to subsection 201-2(4)(xiv) of the UTPCPL. Because we already have concluded that the Cutler Group was not liable to the Hardings under the UTPCPL, this issue is moot.

In their fourth issue, the Cutler Group contends that the trial court erred in finding that the Cutler Group was liable to the Hardings under the catch-all provision of the UTPCPL. This issue is moot. In its revised decision, from which the Cutler Group has appealed, the trial court found that that the Cutler Group had not violated the UTPCPL's catch-all provision.

The Cutler Group's fifth issue concerns the trial court's amended decision and findings of fact. The Cutler Group argues that "[i]t was not only inappropriate for the [trial] court to change [its] factual findings after final judgment and jurisdiction of the lower court had been relinquished, it was legal error to do so." Brief for the Cutler Group at 21. We disagree.

After a party files a notice of appeal, according to the Pennsylvania Rules of Appellate Procedure, a trial court may "[t]ake any action directed or authorized on application by the appellate court." Pa.R.A.P. 1701(b)(5). Here, the trial court requested that this Court remand the matter so that it could vacate the judgment and enter a revised decision. We then granted the trial court's request and relinquished our jurisdiction.

Although the trial court's revised decision did include more specific factual findings, the substance of those findings also appeared in the court's original decision.[4] For example, in its revised decision, the trial court noted

_____

[4] The principal difference between the trial court's original decision and its revised decision relates to the Hardings' UTPCPL claims. As explained, *supra*, the trial court, in any event, erred in finding that the Cutler Group violated the UTPCPL.

that "[t]he 2003 International Residential Code (IRC) established the accepted home building practice[s] and standards in Warwick Township," and then listed specific provisions of the IRC with which the Cutler Group failed to comply. Order and Decision, 10/3/2014, at 2. However, in its original decision, the trial court simply stated that the Cutler Group failed to construct the home "in accordance with the accepted home[-]building practice[s] in Warwick Township." Findings and Decision, 3/4/2014, at 9.

The Cutler Group has not persuaded us that it was "severely prejudiced" by these minor discrepancies. Brief for the Cutler Group at 22. Moreover, the Cutler Group does not cite any case law to support its contention that the trial court "should have ordered a new trial" under these circumstances, and we are aware of none. *See id.* at 19. Accordingly, this issue is without merit.

Finally, the Cutler Group argues that "the trial court abused its discretion and committed an error of law by finding that [the Cutler Group] breached its limited warranty with [the Hardings] where such a finding was clearly against the weight of the evidence produced at trial and shocking to the conscious." Brief for the Cutler Group at 39.

Despite our best efforts, we fail to comprehend the Cutler Group's argument on this issue. Indeed, it is not clear whether the Cutler Group is challenging the weight of the evidence, the sufficiency of the evidence, the trial court's legal conclusions, or something else entirely. *See id.* (arguing that the trial court's finding was "clearly against the weight of the evidence,"

and "shocking to the conscious [*sic*]"); *id.* at 41 (arguing that the trial court "failed to apply its own finding[s] of fact to its decision"); *id.* at 42 (arguing that "it was an abuse of discretion and error of law to find that [the Cutler Group] breached the limited warranty").

The Cutler Group's failure to set forth the standard of review applicable to their claim adds further ambiguity to their argument. In fact, this section of the Cutler Group's brief is devoid of any citation to relevant legal authority.[5] Because the Cutler Group has not developed this issue, it is waived. *See* Pa.R.A.P. 2101 (this Court may quash or dismiss matter if defects in briefs or reproduced record are substantial), 2111 (rules governing content of briefs), and 2119 (requiring discussion and citation of authority). We will not act as counsel to develop arguments on behalf of appellants. *Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007). When defects in a brief impede this Court from conducting

---

[5] In their brief, the Cutler Group cites a single case, *Henderson v. Benson-Hartman Motors, Inc.*, 33 Pa. D. & C.3d 6 (Pa. Com. Pl. 1983), for the proposition that "implied warranties may be limited in duration." Brief for the Cutler Group at 40. That citation is unproductive for several reasons. First, it is well-settled that "appellate courts are not bound by the decisions of the Courts of Common Pleas." *Sysco Corp. v. FW Chocolatier, LLC*, 85 A.3d 515, 520 (Pa. Super. 2014). Second, the language in *Henderson* that the Cutler Group relies upon comes from a federal statute not at issue in this case. *See* 15 U.S.C. § 2308(b). Third, *Henderson* in no way relates to the issue that the Cutler Group has preserved for our review, *i.e.*, whether the trial court's finding was contrary to the weight of the evidence. *See* Statement of Matters Complained of on Appeal, 1/19/2015, at 1; Brief for the Cutler Group at 39.

meaningful appellate review, we may dismiss the appeal entirely or find that certain issues are waived. ***Id.***; ***see also Commonwealth v. Luktisch***, 680 A.2d 877 (Pa. Super. 1996) (deeming issue waived where defendant failed to develop argument in his appellate brief and cited no authority).

For the forgoing reasons, the trial court erred in holding that the Cutler Group violated the UTPCPL. Because the Hardings failed to demonstrate justifiable reliance, the trial court erred in awarding the Hardings damages under the UTPCPL. In all other respects, we affirm.

Affirmed in part and reversed in part. Case remanded. Jurisdiction relinquished.

Judge Donohue joins the memorandum.

Judge Shogan concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/10/2015