# Moyer v. White

*Charles E. Schmidt Jr.,* for plaintiff.
*C. Kent Price,* for defendant.

DOWLING, *J.,* October 7, 1988—The question presented in this case is one of first impression in Pennsylvania: What rights, if any, pass to remote purchasers of real property as against builders/contractors who performed services on behalf of a prior owner? For the reasons that follow, we hold that lack of privity is not an element of a cause of action for breach of contract, and therefore, the jury's verdict in favor of plaintiff may stand.

Plaintiff Darryl Moyer purchased the property in question, a three-story, 28-unit apartment building located at 1700 North Second Street, from the estate of Chester Sheffer on August 20, 1985. In November 1980, defendant Randy White[1] had contracted[2] with Mr. Sheffer to perform electrical re-

---

1. At the time the work was performed, defendant was a sole proprietorship and was not incorporated until July 3, 1986. Because the corporation is the successor in interest to the sole proprietorship, their liability is co-extensive, at least with respect to this action.

2. The parties disagreed as to the scope and nature of Mr. White's obligations under the contract, as it was apparently

wiring services on the building. The work was completed by March 1981 at a cost of approximately $45,000. On March 22, 1986, a fire broke out in a loft area above the third floor of the building which caused extensive damage. Mr. Moyer initiated suit by complaint on October 14, 1986.

Plaintiff tried the case on two theories as alleged in his complaint, one count for breach of contract and one in negligence. Specifically, plaintiff alleged that defendant breached his contract by failing to adhere to City of Harrisburg ordinances and by failing to install the wiring in a "good workman-like manner." The allegations of negligence were essentially the same, as was the proof at trial.

Plaintiff's experts opined that the fire was caused by an electrical short[3] in a metal junction box which was attached to a wooden floor joist in the loft. According to Sidney Rubin, one of plaintiff's experts, the short occurred because an undersized wire nut[4] was used to connect a splice of wires inside the box.

---

never located and thus never produced. However, plaintiff did introduce a copy of the City of Harrisburg electrical permit which indicated the work that was to be performed and the cost as well as photocopies of the canceled checks totaling $47,000 that were issued to Mr. White for payment.

3. The term "short" is an abbreviation for "short circuit," meaning a flow of electricity into an object that was not intended. If a live wire touches an insulator such as a wood joist, nothing occurs because the circuit has not been completed. Here, however, the wire touched the metal cover plate, which was grounded and thereby caused a "short circuit."

4. A wire nut is a small, solderless, pressure type connecting device, the body of which is composed of insulating material, typically plastic, and can be compared in size and shape to a thimble. It is used to connect and insulate a splice of two or more wires. There are three basic sizes that are used depending on the gauge (size) and number of conductors in the splice.

As a result, the wire nut eventually fell off and exposed the ends of the wires. The electricity was thus able to flow or "arc" between the end of the conductor and the metal cover plate on the junction box, which was grounded. The copper conducting wire actually became fused to the underside of the cover plate, and based on the degree of melting, Rubin concluded that the temperature inside the box reached 2200 to 2300 degrees Fahrenheit. As wood ignites at 425 to 500 degrees Fahrenheit, since there were no other heat sources in the loft and because charring of the framing members was most severe at the site of the box, plaintiff's experts concluded that the fire was caused by the short. Defendant's expert, while agreeing that a short occurred within the box, opined that "there was not sufficient total heat energy introduced into this cover plate . . . to ignite the wood . . . so that the wood would burn and keep on burning."

The jury awarded plaintiff $69,901 for breach of contract and $121,399 on the negligence claim for a total of $191,300. Defendant's post-verdict motions[5] raise three issues for our review, the most important of which is noted above. The other two issues are whether the court erred in allowing two of plaintiff's experts to testify beyond the literal scope of their reports and whether the fair market value of the property must be established by plaintiff as part and parcel of his proof of damages.

The question is whether lack of privity bars plaintiff's claim for breach of contract as a matter of law.

---

5. Defendant challenged Mr. Moyer's lack of privity at the pretrial conference held on April 26, 1988. The court denied this motion immediately prior to trial on April 28, and thus allowed plaintiff to introduce evidence which went solely to the contract claim.

The issue is important not only in its own right, but also because the court allowed plaintiff to introduce evidence bearing on wiring deficiencies in areas of the building that were not affected by the fire. If lack of privity is a bar, then a new trial limited solely to the negligence[6] count is required because of the prejudicial effect of evidence submitted on the contract claim.

Moyer contends that his deed[7] either expressly, or at the least implicitly, assigned all rights under the Sheffer-White contract. Moreover, he argues that the mobility of our society, the fact that real estate is bought and sold many times within a short period of time, and the need for accountability for faulty workmanship are compelling reasons to abolish what has come to be a disfavored requirement. His brief cites two opinions. *Spencer v. Leo S. Firanski & Son Inc.*, 55 Wash. Rep. 7, 67 D.&C. 2d 235 (1974) and *Aronsohn v. Mandara,* 98 N.J. 92, 484 A.2d 675 (1984), which abolished the privity requirement in actions based on a breach of implied warranty for defects in construction of *residential* property. Defendant, on the other hand, distinguishes these cases and questions their applicability to the present factual situation.

---

6. Defendant has not contended that privity is an element of the negligence count.

7. The Sheffer to Moyer deed was marked and admitted as plaintiff's exhibit 3 and provides in pertinent part:

"Together with all and singular, the buildings, improvements, ways, waters, water-courses, *rights,* liberties, privileges hereditaments and appurtenances whatsoever thereunto belonging, were in any wise appertaining, and the reversions and remainders, rents, issues and profits thereof; and also, all the estate, *right,* title, interest, use, trust, property, possession, *claim and demand* whatsoever of the grantor in law, equity, or otherwise howsoever, of, in, to, or out of the same." (emphasis supplied)

Our Supreme Court in *Elderkin v. Gaster,* 447 Pa. 118, 128, 288 A.2d 771, 777 (1972), held that a "*builder-vendor* implicitly warrants that the *home* he has built and is selling is constructed in a reasonably workmanlike manner and that it is fit for the purpose intended — habitation." (emphasis supplied) The court noted that nine other jurisdictions had already abandoned the doctrine of caveat emptor in favor of a rule that takes into account the realities of the market place. The vendor's expertise and opportunity to apply that knowledge during the construction process, contrasted with the buyer's ignorance, undermines the notion that they deal at arm's length. This holding was later extended to residential leases in *Pugh v. Holmes,* 486 Pa. 272, 405 A.2d 897 (1979). Both of these cases were landmark and have been cited extensively by numerous courts. However, no Pennsylvania appellate court has decided the question of whether the implied warranty extends to subsequent purchasers. Moreover, footnote 14 of *Elderkin* cautions that the doctrine of caveat emptor is still widely applied in real estate contracts except for the sale of *new homes. Id.* at 127, 288 A.2d at 776. Fortunately, we are guided by many cases from around the country which have dealt with these issues.

We begin with the proposition that abolishing privity is not new to the law of Pennsylvania.[8]

The basis for this conclusion was our Supreme

---

8. One of our brethren on the bench was prompted to write, "The concept of privity is no longer viable and is a dead issue. In many ways, privity of contract reminds the court of those students who are failing Latin who often say, 'Latin is a dead tongue, as dead as it can be, and the sooner that they bury it, the happier I will be.' " *Galbraith v. McLaughlin,* 44 D.&C. 3d 70, 73-4 (1986).

Court's decisions in *Kassab v. Central Soya,* 432 Pa. 217, 246 A.2d 848 (1968) and *Salvador v. Atlantic Steel Boiler Co.,* 457 Pa. 24, 319 A.2d 903 (1974). In *Kassab,* the court held that in an action in assumpsit for breach of implied warranty, purchasers of *goods* may bring suit against remote manufacturers. Again, the court cited the realities of the market place and the need for symmetry within the law as reasons for discarding the privity requirement. The court noted that retail merchants are merely "economic conduits" and that only consumers will actually use and be affected by defective products. *Id.* at 227-8, 246 A.2d at 852-3. Preserving privity only encouraged multiple lawsuits for the same wrong. Additionally, the court cited three policy considerations: the consumer's inability to protect himself from defects; the implied assurances that the goods are safe; and the risk-spreading ability of the manufacturer. *Id.* at 230, 246 A.2d at 854. Finally, the court noted that privity was not a requirement in an action based on section 402A of the Restatement of Torts, and therefore, the result should not turn on the caption of the complaint.

*Kassab* abolished vertical privity, that is, "Who can be sued?" *Salvador* abolished horizontal privity, i.e., "Who can sue?" There, an employee who was injured by an exploding steam boiler was permitted to sue (in assumpsit) the manufacturer of the boiler despite a lack of privity. The court overruled *Hochgertel v. Canada Dry Corp.,* 409 Pa. 610, 187 A.2d 575 (1963), which had refused to expand warranty protection beyond the class of persons enumerated in Pennsylvania's version of section 2-318 of the Uniform Commercial Code. The adoption of section 402A in the 1966 case of *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853, brought to bear an incongruity between the law of contracts and torts, which the

*Salvador* court felt compelled to realign. *Id.* at 3, 319 A.2d at 907. The same "demands of public policy" as well as concerns for "legal symmetry" expressed in *Kassab* required the abolition of horizontal privity. *Id.*

We have found just three Pennsylvania common pleas cases that have considered the rights of remote purchasers of real property as against contractors. In *Spencer, supra,* the court, in an en banc opinion authored by Judge Hanna, held that the implied warranty established in *Elderkin* should be extended to remote purchasers of a *home* as against a *builder-vendor.* 67 D.&C. 2d at 238. After citing conflicting opinions from New Mexico and Colorado, the court reasoned that "there is no logic in insisting on privity of contract simply because we are dealing with real estate instead of a product." 67 D.&C. 3d at 237. The builder of a home should be no different in the eyes of the law than a manufacturer of goods. *Id.* Finally, based on footnote 7 of *Kassab,* the court permitted recovery for property damage and economic loss.

The next case on this issue is *Sports Management Group Inc. v. Allensville Planing Mill Inc.,* 5 Mifflin Leg. J. 133, 16 D.&C. 3d 1760 (1980). In *Sports Management,* a remote purchaser of a *gymnasium* building filed a five count complaint seeking recovery for damages sustained due to the collapse of the roof. Two counts sought recovery in assumpsit, one for breach of express and/or implied warranties and one for breach of an express contractual provision to the effect that "all work was to be completed in a workmanlike manner according to standard practices." 16 D.&C. 3d at 766. With respect to the warranty count, the court cited *Elderkin, Kassab, Salvador* and *Spencer, supra,* as persuasive authority: "[w]e cannot say that extension of implied war-

ranty to the instant factual situation would be unreasonable. Such extension would not constitute a quantum leap in legal development but rather a logical extension consistent with the legal development as reflected in the above-cited cases. . . . Of course, an implied warranty that a building such as a gymnasium is constructed in a reasonably workmanlike manner and is fit for the purpose intended would most likely not be co-extensive with an implied warranty of habitability." *Id.* at 765-766.

As to the breach of the contractual provision, the court sustained a demurrer because the alleged contract, which was attached to plaintiff's complaint, failed to establish a relationship between the defendant and plaintiff's predecessor in title. Moreover, even if the document attached to plaintiff's complaint was a true and correct copy of the contract, the court was "extremely doubtful that plaintiff could establish third-party beneficiary rights" under the theory that "all subsequent owners possess the right to enforce standards of workmanship set forth in the original contract." *Id.* at 767. The court noted, however, that the relief requested under both counts was the same. *Id.*

*Sports Management* also relied on one other case to support its holding that implied warranties can be extended to commercial buildings. In *Metropolitan Edison v. United Engineers,* 4 D.&C. 3d 473 (1977), Judge Takiff ruled that the plaintiff electric company could sue for breach of implied warranty in the design and construction of the Three Mile Island nuclear power plant. Citing *Elderkin* and *Wade v. Haycock,* 25 Pa. 382 (1855), Judge Takiff wrote, "It is well-settled that construction contracts contain the implied warranty that work will be performed in a reasonably workmanlike manner whether or not such a promise is expressly stated." In *Wade,* the

court held that, "Where one contracts to do all the work necessary in the construction of a grist-mill, he is bound to do it in a workmanlike manner, so that it will answer the purpose for which it is intended." 25 Pa. at 383.

More recently, two federal court decisions have permitted claims for breach of implied warranty in commercial construction contracts. *Cluett, Peabody & Co. v. Campbell, Rea, Hayes & Large,* 492 F.Supp. 67 (M.D.Pa. 1980); *Pittsburgh National Bank v. Welton Beckett Associates,* 601 F.Supp. 887 (1985). In *Pittsburgh National,* plaintiff sued to recover for construction defects in the exterior granite facade of its headquarters. The court concluded that the residential-commercial distinction is irrelevant: "Once construction has begun, the vendee has 'no other reasonable choice but to rely on the skill and integrity of the builder.'" 601 F.Supp. at 891; quoting *Bodan v. Fickett,* 24 D.&C. 3d 115, 116 (1982). "Inequality of knowledge" is present regardless of the type of building. *Pittsburgh National* at 892.

The third and most recent case on the question of privity in Pennsylvania is *Galbraith v. McLaughlin, supra.* Defendant built a house on a lot owned by plaintiff's predecessor in title and was sued for latent defects under theories of implied warranty and negligence. The court allowed the claim, concluding that privity "is a dead issue."

We should note that there are several lower court cases that have refused to extend *Elderkin* beyond its literal holding. Thus, in *Henry v. Babecki,* 65 D.&C. 2d 4 (1974), *Kline v. Johnson,* 70 D.&C. 2d 386 (1975) and *Boozell v. Bollinger,* 30 D.&C. 3d 247 (1983), the courts held that an implied warranty does not exist in the sale of used homes in suits between private buyers and sellers. And in *Frisch v.*

*Fernwood Terrace Inc.,* 16 D.&C. 3d 311 (1980), the court refused to invalidate a waiver of implied warranty where the defendant-builder had sold a vacant lot to the plaintiffs on which it eventually built a home, reasoning that plaintiffs were able to deal on an arm's length basis because they owned the building lot and could negotiate an agreement with any contractor they wished. *Id.* at 316-317.

We believe that the implied warranty should not be made to depend on whether a person has a choice as to builders. Once a contractor is chosen and construction begins, the buyer "has no other reasonable choice but to rely on the skill and integrity of the builder. The opportunity for concealment abounds." *Bodan, supra* at 116. At bottom, the warranty is implied to hold builders accountable for their work. Thus, it is implied *by law,* regardless of the contract, and cannot be waived absent a clear understanding, if it can be waived at all. More importantly, our Supreme Court in *Wade* ruled that a warranty of fitness of the purpose intended is implied in commercial construction contracts, which we feel is binding upon us.

The question of privity has been decided by approximately one-half of the states. Some have refused to extend implied warranty protection to remote purchasers, but have permitted identical recovery under a negligence theory. See *Coburn v. Lenox Homes Inc.,* 173 Conn. 567, 378 A.2d 599 (1977), as well as *Liability of Builder of Residence for Latent Defects Therein as Running to Subsequent Purchasers from Original Vendee,* 10 ALR 4th 385 (1981). At least seven other states have refused to extend implied warranties to remote purchasers. See, e.g., *Utz v. Moss,* 503 P.2d 365 (Colo. 1972); *Strathmore Riverside Villas Condominium Assn. Inc. v. Paver Development Corp.,* 369 So.2d

971 (Fla. App. 1979); *Dunant v. Wilmack Inc.,* 176 Ga. App. 48, 335 S.E.2d 162 (1985); *Crowder v. Vandendeale,* 564 S.W.2d 879 (Mo. 1978); *Butler v. Caldwell & Cook Inc.,* 121 App. Div. 2d 624, 505 N.Y. 2d 288 (4th Dept. 1986); *Arvai v. Shaw,* 289 S.C. 161, 345 S.E.2d 715 (1986); and *Brown v. Fowler,* 279 N.W. 2d 907 (S.D. 1979). Some opinions appear to blur the distinction between warranty and negligence. See, e.g., *Wells v. Clowers Construction Co.,* 476 So. 2d 105 (Ala. 1985) and *Wooldridge v. Rowe,* 477 So.2d 296 (Ala. 1985) (holding that lack of privity of contract bars suit for negligent construction; caveat emptor applies); compare *McMillan v. Brune-Harpenau-Torbeck Builders Inc.,* 8 Ohio St. 3d 3, 455 N.E.2d 1276 (1983) overruling *Insurance Co. v. Bonnie Built Homes,* 64 Ohio St. 2d 269, 416 N.E.2d 623 (1980) (holding that privity of contract is not an element in a negligence action brought by a vendee against a builder-vendor). Rhode Island has permitted recovery against the builder where there was an intervening tenancy of one year before the builder sold the property to the plaintiff. Once the first sale has been made, however, recovery is barred. *Brown v. Izzo,* 388 A.2d 806, 807 (1978).

A lengthy discussion of the reasoning employed to bar suits by remote purchasers can be found in *Crowder v. Vandendeale, supra.* There, a second purchaser of a residence sued in negligence to recover damages for settling in the foundation walls, concrete slabs and brick facing. The court held that liability for latent structural defects is grounded exclusively in contract, and thus refused to authorize a cause of action in negligence. The court reasoned that liability is predicated on the fact of the sale, not on the conduct of the builder. The court was also concerned that traditional contract defenses would

not be available under a negligence theory. Moreover, the original parties to the contract should be permitted to allocate risks and liabilities without regard to subsequent purchasers. 564 S.W.2d at 881. Additionally, notice and an opportunity to repair, which is required to state a claim for breach of warranty, is not an element of a negligence claim. Finally, the court pointed to the fundamental aims of tort law versus contract law. "Traditionally" negligence law focused on protecting persons from physical harm and damage to property, usually arising out of a sudden, calamitous event. "However, where mere deterioration or loss of bargain is claimed, the concern is with a failure to meet some standard of *quality*. This standard of quality must be defined by reference to that which the parties have agreed upon." 564 S.W.2d at 882. (emphasis in original) Thus, since a subsequent purchaser is not a party to that contract, it cannot enforce it.

The majority of states that have considered the privity issue have held that it is not a bar either to negligence or implied warranty claims. At least 14 have so held. See, e.g., *Richards v. Powercraft Homes Inc.*, 678 P.2d 427 (Ariz. 1984); *Blagg v. Fred Hunt Co. Inc.*, 272 Ark. 185, 612 S.W.2d 231 (1981); *Redarowicz v. Ohlendorf*, 92 Ill.2d 171, 65 Ill. Dec. 411, 441 N.E.2d 324 (1982); *Barnes v. MacBrown & Co. Inc.*, 264 Ind. 227, 342 N.E.2d 619 (1976); *Degeneres v. Burgess*, 486 So.2d 769 (La.Ct. App. 1986); *Keyes v. Guy Bailey Homes,* 439 So.2d 670 (Miss. 1983); *Aronsohn v. Mandara,* 98 N.J. 92, 484 A.2d 675 (1984); *Oates v. Jag Inc.*, 314 N.C. 276, 333 S.E.2d 222 (1985); *McMillan v. Brune-Harpenau-Torbeck Builders Inc., supra; Elden v. Simmons,* 631 P.2d 739 (Okl. 1981); *Newman v. Tualatin Development Co.*, 287 Or. 47, 597

P.2d 800 (1979); *Gupta v. Ritter Homes Inc.*, 646 S.W.2d 168 (Tex. 1983); *Eay v. Cornwall,* 6 Wash. 595, 494 P.2d 1371 (1972); and *Moxley v. Laramie Builders Inc.*, 600 P.2d 733 (Wyo. 1979). Nearly all of these cases limit the implied warranty to latent defects "not discoverable by a reasonably prudent inspection of the building at the time of sale." *Gupta, supra* at 169. Furthermore, all of these cases involved homes.

Typical of the reasoning used to extend the warranty is that of the Supreme Court of Texas:

"(1) a builder should be in business to construct buildings free of latent defects; (2) the buyer cannot, by reasonable inspection or examination, discern such defects; (3) the buyer cannot normally rely on his own judgment in such matters; (4) in view of the circumstances and the relations of the parties, the buyer is deemed to have relied on the builder; and (5) the builder is the only one who has or could have had knowledge of the manner in which the building was built. As between the builder and owner, it matters not whether there has been an intervening owner. The effect of the latent defect on the subsequent owner is just as great as on the original buyer and the builder is no more able to justify his improper work as to a subsequent owner than to the original buyer." *Gupta v. Ritter Homes Inc., supra,* 646 S.W.2d at 169.

Several opinions stress that the privity requirement imposes a severe hardship that is both arbitrary and unjust. For example, in *Gay v. Cornwall, supra,* the first person to occupy the home was actually the third owner. The court abandoned the privity requirement, reasoning that as between the "wholly innocent and unsuspecting buyer" and the "defendants who built and sold" the house, the loss should equitably fall on the latter. 494 P.2d at 1374.

Two courts were concerned that builders might utilize "strawman" vendees to circumvent the implied warranty protection. *McMillan v. Brune-Harpenar-Atorbeck Builders Inc.*, 455 N.E.2d at 1278; *Richards v. Powercraft Homes Inc.*, 678 P.2d at 430.

We find the reasoning of the latter cases, which rejected the arbitrary privity requirement, to be more in line with contemporary jurisprudence. Moreover, we feel that the reasoning of *Crowder v. Vandendeale* (outlined above) which is the most extensive of the cases that refused to extend protection, is fatally flawed because of a basic misperception as to the nature of the implied warranty. There, plaintiff sued in negligence in an obvious attempt to circumvent the privity requirement. The court feared that authorizing this cause of action would eviscerate the freedom of the builder and first vendee to make their own agreement concerning the quality of the work, the nature and duration of liabilities, etc., without regard to subsequent purchasers. However, the court set up a faulty premise, i.e., that plaintiff's cause of action is necessarily based on the terms of the original contract. This is not the law.

The implied warranty is implied by courts for reasons of public policy, irrespective of the contract. It is like our constitution, because it provides a minimum level of protection, which cannot be taken away. As has been said many times of our constitution, it represents a floor, not a ceiling. The original parties may always agree on standards of quality in excess of those required to make a home "habitable," which standards may or may not be enforced by subsequent owners, depending on the contract. What the builder may not do, however, is disclaim responsibility to subsequent owners. Of course, the owner has the burden to prove that a defect in fact

exists which is attributable to the builder. The builder can also defend on the basis of substantial change or alteration.[9]

Defendant also argues that the rationale behind implied warranty protection does not apply to him, as an electrical contractor. We disagree. Each contractor who performs work impliedly warrants that his work will meet a minimum level of quality, regardless of whether he is the general contractor. Defendant's argument would arbitrarily bar a claim by a person who acted as his own general contractor and then hired different subcontractors to do specific work. There is no sound reason to make this distinction.

Defendant next contends that the court should not have permitted two of plaintiff's witnesses to testify beyond the fair scope of their reports. He first complains that Raymond Lease, an electrical inspector for the Middle Department Inspection Agency, was permitted to testify to violations of Harrisburg city ordinances, in areas of the building not affected by the fire. The essence of defendant's claim is that Mr. Lease was an expert who was permitted to testify beyond the "fair scope" of the report provided prior to trial. Pa.R.C.P. 4003.5. There

---

9. One other defense discussed in many of the cases is the statute of limitations. 42 Pa.C.S. §§5525 and 5526 establish four and six-year periods for actions based upon oral and written contracts, respectively. Section 5536, entitled *Construction projects,* establishes a 12-year bar to claims for deficiency in design or construction of improvements to real property. At least one court has reasoned that "real estate will in all likelihood change hands within that 12-year period" and therefore, the legislature must have contemplated, and hence sanctioned, a suit by a subsequent purchaser. *Galbraith v. McLaughlin,* 44 D.&C. 3d 70, 76 (1986). However, since this issue was not raised, we need not address it.

is no merit to this claim. Counsel for plaintiff wrote the following letter to Mr. White's attorney on April 8, 1988 concerning Ray Lease's testimony:

"This will confirm the fact that I also advised you that I would call Ray Lease from the metal department [Middle Department], primarily as a fact witness. Mr. Lease, however, will testify to violations of the National Electrical Code, which he noticed in the existing wiring at 1700 North Second Street while the property was being repaired from the fire. You may contact Mr. Lease directly if you desire to cover his testimony. You are also welcome to take a deposition, as I had indicated to you."

Defendant's claim regarding the testimony of Sidney Rubin, P.C., is also meritless. Mr. Rubin prepared two reports which were supplied to defense counsel prior to trial. The essence of these reports was that the short caused extremely high temperatures which were sufficient to ignite the wood floor joist. The only information not in the report, and which Mr. Rubin added at trial, were the actual computations to demonstrate that his opinion as to the cause of the fire was supported in theory. The prejudice claimed by defendant is that he was "unable to prepare a meaningful response by way of cross-examination or countervailing expert testimony." However, as plaintiff noted in his brief, "A person of reasonable intelligence would have anticipated that an electrical engineer with Mr. Rubin's background would have done some calculations in arriving at his opinions." Moreover, defendant was in fact able to attack this theory through his own expert who testifed that "there was not sufficient total heat energy" to cause the fire.

Defendant's final contention concerns the burden

of proof regarding the appropriate measure of damages. Both parties agree that in Pennsylvania, the measure of damages is the cost of repair not to exceed the fair market value of the property at the time of loss. *Commonwealth, Dept. of Transportation v. Estate of Crea,* 92 Pa. Commw. 242, 483 A.2d 996 (decided 1977, published 1984). Defendant argues, however, that it was incumbent upon plaintiff to submit evidence on cost of repair *and* fair market value before the issue of damages could be submitted to the jury. We disagree.

Although there are no Pennsylvania cases on this point, common sense would dictate that it is defendant's burden to challenge plaintiff's damages. Placing that burden on the plaintiff would seriously undermine the adversarial nature of our trial system. We approvingly quote the following:

"Where there are two possible measures of damages and plaintiff adopts one of them, it is incumbent on defendant to show that the other measure would be less expensive to him." 25A C.J.S. §144(e) at 22.

"Generally, the plaintiff is obligated to establish the amount of damages using only one measure, although other measures may be applicable and even though a different measure of damages would yield a lesser award; it is the defendant's obligation to prove that a lesser amount than that claimed by plaintiff would sufficiently compensate for the loss." 22 Am.Jur.2d §402 at 489 (1988).

Accordingly, we enter the following

## ORDER

And now, October 7, 1988, defendant's motion for post-trial relief is denied.